**Kathleen Ann McWILLIAMS, Plaintiff,**

**v.**

**WESTERN PENNSYLVANIA HOSPITAL, a Corporation; and, Anna Kurtz, an individual, jointly and severally, Defendants.**

**Civ. A. No. 86–2572.**

United States District Court,
W.D. Pennsylvania.

June 30, 1989.

Robert L. Garber, Pittsburgh, Pa., for plaintiff.

Aims C. Coney, Jr., Suzanne L. DeWalt, Pittsburgh, Pa., for defendants.

## OPINION

D. BROOKS SMITH, District Judge.

This summary judgment motion presents this Court with a claim under Title VII of the Civil Rights Act for discrimination due to plaintiff's national origin. Plaintiff has appended numerous state actions asserting tort, contract and handicap discrimination claims.[1]

Plaintiff, a former employee of Western Pennsylvania Hospital (West Penn), alleges that her supervisor, Anna Kurtz (Kurtz), made plaintiff's environment oppressive and intolerable because of plaintiff's Irish ancestry. Plaintiff claims Kurtz' conduct led to her constructive discharge.

Plaintiff was a data processing entry clerk under Kurtz' supervision beginning in October 1978. Plaintiff contends that Kurtz "singled her out almost from the beginning of McWilliams' [Plaintiff] employment, as the object of Kurtz' animosity, discrimination and harassment." Plaintiff's Brief, p. 3–4. Plaintiff recites numerous incidents which she alleges support her claim. These include that she was not permitted to go to the bathroom unless it was her break time or lunch hour, she was not to talk to the other women in the department, she was to keep away from the men, she was not to wear perfume or hairspray and she was not to use the phone. All of these restrictions were placed on plaintiff within the first six months she was at West Penn. Plaintiff's depo. p. 148–151.

Plaintiff also alleges that Kurtz physically harassed her. During the first six months of plaintiff's employment Kurtz allegedly pulled a chair out from under plaintiff when she went to sit down, threw work

---

**1.** Title VII proscribes employment discrimination on the basis of race, color, religion, sex and national origin. Title VII does not extend to handicap discrimination. 42 U.S.C. § 2000e–2(a). Pennsylvania's Human Relations Act, however, proscribes discrimination on the basis of race, color, religious creed, ancestry, handicap or disability, age, sex and national origin. 43 Pa.S.A. § 953.

at her, threw a phone receiver at plaintiff and pushed her. Plaintiff's depo. p. 223–226.

Subsequently, within the next two to two and a half years, Kurtz made an alleged derogatory remark about Irish people, plaintiff's ancestral heritage. Plaintiff testified about the incident during her deposition as follows:

Q. Now, you previously testified that Anne Kurtz made derogatory remarks concerning your national origin?

A. Yes.

Q. Again, when did she make them, what did she say and who was around?

A. She made them like, to the best of my recollection, it was around I think right before St. Patrick's Day. And I don't even know how the subject was brought up. But she said, "I don't like Irish people. In fact, I hate Irish people. And I'm sure glad George isn't Irish." And when I—I looked at her. And Judy Coyne, who sat beside me, looked at me. And Judy said to me, "I don't believe she said that."

Q. Now, I may be mischaracterizing your testimony, and I want you to correct me if I have, it's my understanding you don't remember exactly which St. Patrick's Day this was?

A. Huh-uh.

Q. But it was within the first three years of your employment, is that correct?

A. Yes, it had to be within that realm of time. I think it had to be like three days before St. Patrick's Day. That's why I believe the subject was brought up, because it was around St. Patrick's Day.

Q. Around St. Patrick's Day?

A. Yes.

Q. But you're not certain of the year?

A. No.

Q. Who was George?

A. George was Ann's husband.

Plaintiff's depo. p. 278–279. Plaintiff also related one other instance in which Kurtz made reference to plaintiff's Irish heritage. Plaintiff testified:

A. I know that I had an Irish flag, it was a small Irish flag that I kept on my desk. And she asked me why I had it there.

Q. When did you have an Irish flag on your desk?

A. It was, well, I guess it was there when I left, because it was part of the stuff that I had packed. It was just a small flag (indicating).

Q. When did she ask you about the flag?

A. Maybe when I brought it in.

Q. Do you know when you brought it in?

A. No, I don't. I know I purchased it in Ligonier and I brought it in after that.

Q. Was it within the first three years of your employment?

A. Roughly guessing, I guess so.

Q. Could it have been within the first two years of your employment?

A. Could have been.

Q. Could it have been within the first one year?

A. I'm not too certain about the first year.

Plaintiff's depo. p. 280. Despite the fact that there was another employee of Irish heritage in Kurtz' department, plaintiff testified she was the only one singled out and treated in the above manner by Kurtz. Plaintiff's depo. pp. 44–45, 306.

Plaintiff objected to the manner in which Kurtz treated her. In fact, within two days after her six month probationary period was over, plaintiff complained to Kurtz's supervisor, Bruno Petrilli. Plaintiff's depo. p. 246. Petrilli did little to address plaintiff's concerns, in plaintiff's opinion. Nevertheless, plaintiff occasionally spoke with Petrilli about her conflict with Kurtz.

Plaintiff's conflicts with Kurtz allegedly became worse after plaintiff injured her back at work in September 1981. Plaintiff's depo. p. 119. This back injury occurred while plaintiff was on a messenger delivery run. The delivery runs required plaintiff to push a large cart to different areas of the hospital and then lift and deliver various items to their designated

site. Plaintiff's depo. p. 73–74. Plaintiff's injury caused three extended absences from work during which plaintiff received worker's compensation. These absences were from September 22, 1981, until June 8, 1982, November 1, 1982, until January 21, 1983, and January 18, 1984, until August 31, 1984. Plaintiff's depo. Exhibit 10. Plaintiff's return to work on each occasion was on a part time basis. Petrilli depo. p. 36, Plaintiff's depo. Exhibit 10. Plaintiff claims that Kurtz harassed her upon her return to work by continuing to assign her to the delivery runs in disregard of lifting restrictions imposed by plaintiff's physical conditions. Plaintiff's depo. p. 154. After her back injury, however, plaintiff was assigned delivery runs with a second employee. *Id.* Plaintiff asserts that Kurtz also changed her seat, placing her in front of the air conditioner despite medical restrictions to the contrary. Plaintiff depo. p. 201.

Again, plaintiff objected to Kurtz's supervisor, Petrilli. Her concerns were then addressed by Petrilli's supervisor and the hospital's assistant executive director who met with plaintiff. She recited her entire story. The hospital executives concluded that plaintiff's situation was due to a personality clash. Plaintiff depo. p.. 253–254.

Plaintiff cites other examples of harassment by Kurtz which transpired during her employment at West Penn. These include: Kurtz's interference with plaintiff's attempts to obtain other hospital jobs to transfer out of the department, plaintiff depo. 153–154, Kurtz's interference with plaintiff's attendance at West Penn's safety committee meetings, threats to dock her time card when she was late, disciplining her in front of other employees and not informing her that she had been selected for a displaywriter program which would have transferred plaintiff to another department. Plaintiff depo. 220. The last incident contributing to an alleged intolerable work environment happened in December 1984. Plaintiff's holiday schedule was changed, which interfered with her arrangements for a doctor's appointment and holiday party. Plaintiff made potential scheduling switches with another employee. Kurtz refused to approve of the switch. At this point, plaintiff handed in her resignation. Plaintiff depo. p. 68–71.

■ Thereafter, plaintiff filed numerous administrative claims and this lawsuit. Plaintiff seeks to recover money damages on the theory that her resignation was a constructive discharge based on her national origin.[2] The Third Circuit has held that constructive discharge in a Title VII case can be found if an "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 888 (3rd Cir.1984). Accordingly, to establish a prima facie case of national origin discrimination in a constructive discharge action, a plaintiff must prove (1) she belongs to a protected class; (2) she was qualified for the position she held and was performing it satisfactorily; (3) despite her qualifications she was constructively discharged; and (4) she was discharged while other employees not in her protected class were retained. *Spangle v. Valley Forge Sewer Authority,* 839 F.2d 171 (3rd Cir. 1988) (constructive discharge in an ADEA suit); *See Jalil v. Avdel Corp.,* 873 F.2d 701 (3rd Cir.1989).

■ In this summary judgment matter defendants may prevail by showing that plaintiff will not be able to establish her prima facie case of national origin discrimination.[3] *Spangle,* 839 F.2d at 173. Defendants, in fact, contend that plaintiff is un-

---

**2.** Plaintiff has refused West Penn's offer of reinstatement. Plaintiff depo. Exhibit 6 and 7. We, therefore, presume plaintiff seeks only the back pay, front pay and liquidated damages asserted in her prayer for relief. Plaintiff's Amended Complaint.

**3.** We note, in the alternative, that defendants also may prevail if they have produced a legit-

imate non-discriminatory reason for its action and plaintiff is unable to show that the proffered reason is a pretext for discrimination. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3rd Cir.1987). Inasmuch as defendants have not addressed this alternative, we decline to do so as well.

able to establish the third element; that is, that despite her qualifications plaintiff was constructively discharged. Our focus, therefore, is on this third element[4] which requires that (1) the employer knowingly permit; (2) conditions of discrimination in employment; and (3) said discrimination creates an environment so intolerable that a reasonable person subject to it would resign. *Goss*, 747 F.2d at 885; *Levendos v. Stern Entertainment, Inc.*, 860 F.2d 1227 (3rd Cir.1988).

Defendants contend that plaintiff is unable to establish that employment was so intolerable that a reasonable person in her place would resign. Defendants' Brief, p. 12. Since constructive discharge is usually a factual determination, we will not address the degree of oppressiveness of plaintiff's work environment and how a reasonable person would react. *See Levendos*, 860 F.2d at 1230. Rather, our inquiry is concentrated on whether there are discriminatory acts which could make the plaintiff's work environment intolerable.[5]

Constructive discharge claims under title VII require "acts of discrimination in violation of Title VII ..." which make working conditions so intolerable that a reasonable employee would be forced to resign. *Goss*, 747 F.2d at 887. Hence, the discriminatory conduct must be associated in some fashion with the intolerable atmosphere leading to the constructive discharge. For this reason, there must be at least some relation between the occurrence of the discriminatory conduct and the employee's resignation. *Cf. Jett v. Dallas Independent School Dist.*, 798 F.2d 748 (5th Cir.1986) (resignation five months after discriminatory action did not constitute intolerable conditions); *Hill v. K-Mart Corp.*, 699 F.2d 776 (5th Cir.1983) (alleged discriminatory incidents took place long before employee's resignation); *Barbetta v. Chemlawn Services Corp.*, 669 F.Supp. 569 (W.D.N.Y.1987) (passage of time between discriminatory act and resignation factor to be considered). Moreover, in the context of a national origin discrimination claim the plaintiff must show more than the "mere utterance of an ethnic epithet which engenders offensive feelings in an employee ..." *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir.1972).[6]

In the instant case, plaintiff's entire case of national origin discrimination rests on two incidents occurring within the first three years of her six year term of employment. The first incident involved an alleged derogatory utterance about plaintiff's ethnic group, a statement which was made during conversation preceding St. Patrick's Day that was not directed toward the plaintiff personally. The second incident concerned an inquiry about an object plaintiff brought to work indicating her national origin, an inquiry which in and of itself is not facially discriminatory. Such a question is not patently out of place in an employee office where discussion is easily prompted by the appearance of a new or unfamiliar hairstyle or fashion, or a new picture or other noticeable addition to one's desk.

---

4. Although our focus is on the third element of plaintiff's prima facie case, we note plaintiff has established that she is a member of a protected group, that she was qualified for the position and performing it satisfactorily, and that others not in her protected group were retained. Plaintiff is Irish and this is a protected group because it is the country from which plaintiff's ancestors came. *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973); *Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667 (9th Cir.1988). Plaintiff is qualified for the position since she held the job for several years, was offered reinstatement and allegedly was to be selected for a position requiring greater skill. *See Jalil*, 873 F.2d at 702. Other non-Irish employees in the department were not subjected to similar treatment.

5. We note that our research of Third Circuit decisions regarding whether a plaintiff has established the element of constructive discharge in a Title VII or ADEA case have addressed only the aspect of whether the conditions could be so intolerable as to induce a plaintiff's resignation. *See Goss*, 747 F.2d at 885; *Levendos*, 860 F.2d at 1227.

6. *Compare Snell v. Suffolk County*, 782 F.2d 1094 (2nd Cir.1986); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir.1977); *EEOC v. Murphy Motor Freight*, 488 F.Supp. 381 (D.Minn.1980).

Plaintiff cites no other instances of discriminatory conduct. Indeed, the record is devoid of any indicia that Kurtz expressed disdain for Irish nationals after these two statements despite the yearly reminder of St. Patrick's Day.

Not only is there a paucity of discriminatory conduct in this case, but there is also no connection between the alleged acts of discrimination and plaintiff's resignation. Plaintiff testified that Kurtz's alleged anti-Irish statements were made during the first three years of her employment. Yet plaintiff continued to work for another three years before resigning.

We recognize that plaintiff's work environment may have been intolerable due to her litany of other complaints. These complaints on their face, however, are not discriminatory. Nor are they latently discriminatory, as they might be in a race or sex discrimination case. Moreover, several of plaintiff's complaints cannot even form the basis for her intolerable work environment. For example, plaintiff claims that one of the conditions making her employment intolerable was the fact that Kurtz failed to inform plaintiff of her potential selection for a displaywriter program. If plaintiff did not know about this omission before her resignation, this omission could hardly contribute to an allegedly intolerable atmosphere.

Likewise, plaintiff complained that Kurtz continued to assign her to do the messenger runs despite medical restrictions. Plaintiff testified, however, that after her back injury she was assigned messenger runs with another employee. Plaintiff's reference to Kurtz's interference with plaintiff's attempts to obtain other hospital positions was based on Kurtz's cancellation of plaintiff's appointments for interviews. Again, plaintiff testified that although scheduled interviews were cancelled, she was able to reschedule them. Plaintiff depo. p. 153–154.

Plaintiff's seat placement in front of the air conditioner also allegedly contributed to plaintiff's resignation. Plaintiff's seat change however was made between October and December 1984, a period of time during which air conditioners are not used in Pittsburgh. Plaintiff depo. p. 201. Defendants should not be held accountable for the fact that the room was always cold. *Id.* Lastly, plaintiff's complaints regarding physical harassment in the nature of pushing or throwing things relates to the first six months of her employment. Plaintiff was unable to cite any further incidents.

Certain of plaintiff's complaints do not warrant discussion, and we hold firm to our conclusion that plaintiff's work environment was not intolerable due to acts of discrimination.

> Every job has its frustrations, challenges and disappointments; these inhere in the nature of work. An employee ... is not, however, guaranteed a working environment free of stress. The employment discrimination laws require as an absolute precondition to suit that adverse employment action have occurred. They cannot be transformed into a palliative for every workplace grievance, real or imagined, by the simple expedient of quitting.

*Bristow v. Daily Press, Inc.*, 770 F.2d 1251 (4th Cir.1985).

We find that the two alleged acts of discrimination fail to create an atmosphere charged with discriminatory overtones towards Irish individuals which would make plaintiff's employment intolerable. We are mindful of the Third Circuit's decision in *Levendos v. Stern Entertainment, Inc.*, in which Judge Higginbothan stated:

> We cannot state as a broad proposition of law that a single non-trivial incident of discrimination can never be egregious enough to compel a reasonable person to resign.

860 F.2d at 1232. *Levendos*, however, addressed whether the plaintiff's allegations of sex discrimination were intolerable enough to compel a reasonable person to resign. *Levendos* did not consider, as we do here, whether the intolerable nature of plaintiff's work environment is due to the requisite discriminatory acts.

In short, we conclude that although plaintiff's work environment may have been intolerable, it was not attributable to

discriminatory acts against Irish individuals. As plaintiff testified, Kurtz just did not like her. Plaintiff depo. p. 212. Though this may be unfortunate in an employment context, it "is not cognizable under the Civil Rights Act...." *Fekete v. United States Steel Corp.*, 353 F.Supp. 1177, 1186 (W.D.Pa.1973). We hold that a constructive discharge claim under Title VII does not arise when conditions of employment are intolerable and an individual resigns without more. Plaintiff cannot convert her resignation into a congressionally forbidden " 'constructive discharge' absent the impermissible factors." *Hill v. K-Mart Corp.*, 699 F.2d at 779 (*citing Junior v. Texaco, Inc.*, 688 F.2d 377 (5th Cir. 1982). We will grant the defendants' summary judgment motion.

Our disposition of plaintiff's Title VII claim divests this Court of any basis for the continued exercise of federal jurisdiction. We, therefore, will remand plaintiff's pendant state claims to the Court of Common Pleas. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### ORDER

AND NOW, this 30th day of June, 1989, upon consideration of the Motion for Summary Judgment by defendants, with briefs in support and in opposition thereto, and consistent with the accompanying Opinion, it is

ORDERED, that:

1. Defendants' Motion for Summary Judgment as to plaintiff's cause of action for constructive discharge because of national origin discrimination in violation of the Civil Rights Act is granted.

2. Plaintiff's pendent state law claims are remanded to the Court of Common Pleas of Allegheny County.

3. The Clerk of Court is directed to mark this case closed.