Regina DICKERSON, Plaintiff,

v.

STATE OF NEW JERSEY, DEPARTMENT OF HUMAN SERVICES, et al., Defendants.

Civ. No. 89–2367 (GEB).

United States District Court, D. New Jersey.

July 10, 1991.

Dennis A. Drazin, Red Bank, N.J., for plaintiff.

Pamela B. Catten, Trenton, N.J., for defendant.

## OPINION AND ORDER

GARRETT E. BROWN, Jr., District Judge.

Plaintiff Regina Dickerson filed the instant action on May 30, 1989, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. §§ 1981 and 1983.[1] Plaintiff claims that defendant, the State of New Jersey Department of Human Services ("DHS"), created a racially hostile work environment which made plaintiff's continued employment intolerable. Plaintiff further claims that as a result of DHS' tolerance of this environment she was constructively discharged. Plaintiff seeks a declaratory judgment that the discriminatory practices complained of are unlawful and violative of Title VII of the Civil Rights Act of 1964 and of the Civil Rights Act of 1866. Plaintiff also seeks to permanently enjoin DHS, its agents, successors, employees, attorneys and those

---

**1.** Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (the "EEOC") on July 29, 1988. The EEOC issued a Notice of Right to Sue on March 2, 1989.

acting in concert with them from engaging in the unlawful discriminatory practices committed by DHS and their agents as set forth above. Finally, plaintiff seeks reinstatement, back pay, punitive damages, costs and attorney's fees.

On August 4, 1989 DHS filed a counterclaim asserting plaintiff's claim to be vexatious. DHS seeks repayment for unearned wages and a uniform allowance erroneously issued to plaintiff. DHS further seeks reasonable attorney's fees and costs for plaintiff's alleged vexatious claim.

In a Memorandum and Order filed on December 7, 1989, this Court granted DHS' motion to dismiss plaintiff's §§ 1981 and 1983 claims, holding that these claims were proscribed by the Eleventh Amendment. This matter was tried to the Court without a jury. I have reviewed the submissions of the parties and the tape transcripts of the witnesses' testimony at the trial. I have concluded that judgment must be entered for plaintiff for the reasons set forth herein. The following constitute my Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

This Court has jurisdiction over this controversy pursuant to 28 U.S.C. § 1331.

Plaintiff is an African American female who was employed by DHS as a provisional police officer from May 5, 1986 until her resignation effective July 28, 1988. From May 5, 1986 until sometime in April of 1988 plaintiff was employed at DHS' Marlboro Psychiatric Hospital ("Marlboro"). From April of 1988 until July 28, 1988, she was employed at DHS' Arthur Brisbane Child Treatment Center ("Brisbane"), a psychiatric facility for children. Plaintiff submitted a letter of resignation dated July 18, 1988, formally resigning on July 28, 1988. At the time of her resignation, she was earning approximately $23,000 per year, plus overtime. At this time, plaintiff had taken unearned leave which when converted to unearned wages amounted to $820.70. In addition, she was erroneously issued

$910 as a uniform allowance on July 22, 1988.

DHS employed seventeen to eighteen police officers at Marlboro in varying capacities during plaintiff's tenure at DHS. At the time relevant to the instant action, the DHS police force was commanded by Chief of Police Raymond Brennan ("Brennan"). The DHS police force was staffed by eight to nine individuals acting as fully trained police officers and the rest acting as "provisional" police officers. The fully trained police officers were formally trained at a police academy and were permitted to carry a firearm, a nightstick and mace. The provisional police officers were not formally trained at the police academy and were not permitted to carry these weapons.[2]

There were four black officers on the DHS police force during plaintiff's employment at DHS. The black officers were plaintiff, Sergeant Seaman ("Seaman"), Officer Hamlin and Officer Harry Willis ("Willis"). The racial incidents which occurred at DHS were primarily directed at Willis and plaintiff.

Willis was a DHS police officer stationed at Marlboro during the period 1980 to 1983. At that time, Willis was the president of the Policeman's Benevolent Association ("PBA") Local 113 at the DHS police Department. In 1983, Willis resigned to take a position as a federal police officer in Lakehurst, New Jersey. After one year at Lakehurst, Willis reapplied for a position with DHS and was eventually rehired in 1986. Willis was initially assigned to the Trenton Psychiatric Hospital ("Trenton"). While at Trenton, Willis filed several unspecified grievances and was eventually reassigned to Marlboro. When Willis returned to Marlboro, he once again acted as a local PBA representative. The racial incidents which form the basis of plaintiff's complaint began shortly after Willis' return to Marlboro.

On or about April 29, 1987, just after Willis had returned to Marlboro from Tren-

---

**2.** Throughout this opinion the distinction between fully trained police officers and provisional police officers will be made where relevant. When such a distinction is not necessary or unknown, however, the individual officer or officers will be referred to as "police officer(s)" or "officer(s)."

ton, Willis found what he described as a picture of a black man atop a DHS insignia with the notation "He's Back" in his mailbox. *See* Plaintiff's Exhibit 6.

On or about February 19, 1988, a racially hostile picture appeared on a wall in the men's restroom at Marlboro. The picture depicted a hooded Klansman with the letters KKK written across it. To the right side of the picture was written: "How [sic] the water Harry[.]" *Id.*, Exhibit 2. At or about the same time of the restroom incident, Willis' DHS locker was defaced. The term "niger" [sic] and the same hooded Klansman that appeared on the restroom wall were scratched onto the surface of the locker. *Id.*, Exhibit 3. Management at the Marlboro facility were advised of these matters on the same day that Willis discovered them. Willis filed a grievance with the Equal Employment Opportunity and Affirmative Action office at DHS ("Affirmative Action") concerning these matters on or about February 24, 1988. The picture in the restroom remained there for some four months until the wall was repainted. Plaintiff and other officers at Marlboro were exposed to the racial graffiti in the men's restroom. Plaintiff testified that she saw both the graffiti on the bathroom wall and on Willis' defaced locker.

On or about March 6, 1988, Willis was involved in an incident with Officer Hoy ("Hoy"), a white male police officer employed at Marlboro. Hoy and Willis had an argument about PBA cards. Apparently, as the PBA representative, Willis' duties included distributing PBA cards. The argument became somewhat heated and when Willis indicated he did not know where Hoy's cards were, Hoy stated "I don't give a f___ and I'am [sic] going to give you two f_____ weeks to get my cards." *Id.*, Exhibit 1. Hoy had to be physically restrained by several other Officers, including plaintiff. Hoy threatened Willis saying: "I'll kill that mother f_____[.]" *Id.* Willis filed a complaint with DHS concerning the incident, dated March 6, 1988. *Id.* In recounting the incident at trial, Willis testified that Hoy said: "I'm going to kill your black ass," and "I'm going to kill you, nigger." While Willis'

report contains no reference to these racial slurs, Seaman testified that Willis may have told him that Hoy said "I'll kill that nigger." Seaman also testified that it was probable that Willis told him that Hoy called Willis a "nigger" and Officer Clifford Olsen ("Olsen"), another white male Officer employed at Marlboro, on another occasion called Willis a "f_____ nigger." Willis reported Olsen's comment to his supervisor, Lieutenant Kirn ("Kirn"), and submitted a report to DHS on the incident. The report, however, was never introduced into evidence. Plaintiff testified that she overheard Olsen making a reference to "those f_____ niggers" sometime early in 1987. There was no evidence of any action taken by management as a result of this later incident.

On or about March 28, 1988, while Willis was in the locker room at Marlboro, Olsen remarked "f___ the niggers" as he entered the locker room. Willis apprised management at Marlboro of the incident the following day. On or about April 2, 1988, another incident occurred involving Willis' locker. A green substance was squirted through the key hole in the locker, soiling Willis' uniform and boots. Plaintiff's Exhibit 4. Plaintiff saw Willis' soiled belongings. Willis filed a grievance with Affirmative Action regarding both of these incidents on or about April 4, 1988. On or about this date, someone also urinated in Willis' locker. There is no indication as to whether a complaint or any kind of formal grievance was submitted as a result of this later incident; however, Willis did advise management of the situation.

Willis testified that he overheard a reference to "the nigger" in a conversation between Officers Sherwan and Fuzino, two white Officers at Marlboro. Willis further testified that incidents such as these were occurring "every other day" and that at some point, someone wrote "Puerto Rican rat" on a Puerto Rican officer's time sheet. Willis indicated that supervisory personnel were aware of all of these incidents. Plaintiff testified that she also saw the defaced time sheet.

Plaintiff became acquainted with Willis during her employment at Marlboro. After Willis returned to Marlboro, white friends of both plaintiff's and Willis' were criticized because of their friendships with black people. These non-black officers were referred to as "nigger lovers." Sergeant Lu Ann Aquila, now Lu Ann Aquila Tansey ("Aquila"), a white female officer who was one of the supervisors at Marlboro during plaintiff's tenure at DHS, testified that she was referred to by white officers at Marlboro as a "nigger lover," and that she heard racial slurs by officers at Marlboro once or twice per month during the period relevant to the instant action.

On or about April 1, 1988, plaintiff's locker was defaced and ransacked. The Klansman figure appeared on her locker with the letters KKK written across the bottom of the figure. Also written on the locker was the phrase "niger [sic] bitch we don't want you." Plaintiff's Exhibit 7. In addition, plaintiff's papers and reports were strewn about, and her hat and uniform were soiled with a green lotion of some kind. Plaintiff notified Willis of the incident. Willis in turn notified Aquila. Upon hearing of the incident Aquila stated: "This is terrible. Enough is enough."

On the Monday following the defacement of plaintiff's locker, plaintiff and Willis personally traveled to the DHS Affirmative Action office to advise them of the situation. Plaintiff already had a discrimination claim pending there.[3] Catherine Farley ("Farley"), the Assistant Commissioner of Affirmative Action, initiated an investigation of the defacement of plaintiff's locker. After plaintiff told Farley that she was in fear for her safety, Farley advised plaintiff that arrangements would be made to place plaintiff somewhere else while the investigation was conducted. Farley assigned Sharon Waters ("Waters"), an Equal Opportunity Officer at Affirmative Action, to conduct the investigation. Farley also instructed the police unit at DHS to initiate a criminal investigation.

Sometime shortly after meeting with Farley, plaintiff was telephoned by Kirn, who instructed plaintiff to begin working at Brisbane the following day. Plaintiff testified that Kirn was "very nasty" on the telephone and asked plaintiff why she reported the incidents of racial harassment to Affirmative Action without calling him.

Plaintiff began working at Brisbane on or about April 5, 1988 and continued to work there for some 4 months until her resignation on July 28, 1988. While at Brisbane, plaintiff was posted to an evening shift, 2 p.m. until 9 p.m., and was the only officer assigned to her shift. As a result, plaintiff had no other police officers to turn to. At Marlboro, fully trained police officers generally assisted the provisional police officers with their investigations. Furthermore, while at Brisbane, plaintiff was not given a vehicle or any radio communication equipment. Plaintiff was forced to use a telephone to call for backup. On one occasion, plaintiff received a report that the boyfriend of one of the patients had telephoned Brisbane and threatened to forcibly remove his girlfriend from the facility. Plaintiff called Marlboro for backup. Rather than sending backup, plaintiff was instructed to call the State Police and the Wall Township Police for assistance.

In the interim Aquila filed a report regarding the locker incident dated April 12, 1988. Defendant's Exhibit 4. Aquila labelled the incident as one of "criminal mischief" and concluded her report by stating: "INVESTIGATION TO CONTINUE." *Id.* Brennan admitted that criminal mischief is simple vandalism. Thus the investigation was not treated as one of racial harassment. Seaman was assigned to conduct the police department's investigation. In a report dated August 8, 1988, well after plaintiff had finally resigned, Seaman stated that he telephoned plaintiff's residence and was told by plaintiff's husband that

---

3. Sometime in 1988, plaintiff filed a grievance with Affirmative Action regarding preferential treatment of shift assignments, duty assignments and the assignment of regular days off.

Plaintiff claimed that a less senior white officer, Pam Antolick, was regularly given more favorable treatment in these areas. Plaintiff also raised this issue at trial.

plaintiff was "through with the matter and ha[d] no additional information to offer...." *Id.* Seaman recommended that the matter be administratively closed, to be reopened upon the receipt of additional information. The report concluded with the statement: "CASE CLOSED." *Id.*

In conducting Affirmative Action's portion of the investigation, Waters contacted plaintiff on two occasions and interviewed all of the officers at Marlboro regarding the locker incident. Just prior to her resignation on July 28, 1988, plaintiff was contacted and told that the investigation was complete. She was told that she had nothing to worry about and that she was well liked at Marlboro. Plaintiff was told her problems were a result of her friendship with Willis. In a letter addressed to plaintiff dated July 21, 1988, and signed by Farley and Equal Employment Opportunity–Affirmative Action Officer Shirley Bridgewater, plaintiff was informed that Affirmative Action had found that on two occasions a less senior white female officer was given preferential treatment in shift assignments. However, Affirmative Action found no evidence of preference given with respect to duty or regular days off. While the letter makes specific reference to racial discrimination, it did not address plaintiff's claims with respect to her locker or to her return to Marlboro. Rather, the letter stated that plaintiff "ha[s] submitted [her] resignation and stated no desire for corrective action." *Id.*, Exhibit 2.

In a memorandum circulated to all Human Services Police Personnel from Brennan dated September 20, 1988, well after plaintiff resigned, Brennan stated that any discriminatory or derogatory acts and comments "motivated by either race, ethnicity or sex" violate DHS' policy against discrimination. Brennan went on to warn that those employees violating this policy would be subject to "severe disciplinary action." *Id.*, Exhibit 3. Prior to this memorandum, no notice of any kind was circulated to the DHS police force outlining the department's policy against discrimination. In addition, none of the members of the DHS police force received any training on race relations or prohibited discriminatory behavior aside from certain training that the fully trained police officers received at the police academy. It should be noted that none of the provisional police officers received any such training. In only two instances during the time relevant to the instant action were officers disciplined for engaging in discriminatory actions. The first involved Olsen's reference to Willis as a "nigger." Olsen was ordered to apologize to Willis. The second involved Hoy's altercation with Willis concerning the PBA cards. Brennan testified that as a result of Hoy's actions he was "reprimanded." The record does not indicate the nature of the reprimand that Hoy received.

## CONCLUSIONS OF LAW [4]

In a letter dated April 19, 1990, S. Howard Woodson, Jr., the director of Affirmative Action, responded to a discrimination complaint filed by Willis against DHS on August 8, 1988 (the "Woodson Report"). *See* Plaintiff's Exhibit 5. Affirmative Action is a division of the New Jersey Department of Personnel, a state agency. In the Woodson Report, Affirmative Action found, on nearly the identical facts presented above, that a hostile work environment existed at Marlboro. Affirmative Action further found probable cause to believe that Willis was subjected to harassment on the basis of his race and color while he was employed at Marlboro. *Id.* At trial, defendant contested the admissability of the Woodson Report on hearsay grounds. The Court reserved ruling on the admissability of the report and permitted the parties to brief the issue.

There is conflicting authority on whether a preliminary EEOC determination, or a similar determination made by an equivalent state agency, is admissible into evidence. Many courts have held that determinations such as these are admissible hearsay under the federal Business

---

4. To the extent that the "Conclusions of Law" portion of this opinion contains findings of fact in addition to those expressly set forth under the heading "Findings of Fact," they shall be deemed to be part of the findings of fact.

Records Act, 28 U.S.C. § 1732, or under the public records exception of the hearsay rule outlined in Fed.R.Evid. 803(8)(C). *Abrams v. Lightolier, Inc.*, 702 F.Supp. 509, 512 (D.N.J.1988) (citing *Plummer v. Western Int'l Hotels Co.*, 656 F.2d 502, 505 (9th Cir.1981); *Bradshaw v. Zoological Society of San Diego*, 569 F.2d 1066, 1069 (9th Cir.1978); *Smith v. Universal Services Inc.*, 454 F.2d 154, 157–58 (5th Cir.1972); *Strickland v. American Can Co.*, 575 F.Supp. 1111, 1112 (N.D.Ga.1983)). Some courts have made such a determination even in cases tried to a jury. *See Plummer*, 656 F.2d 502; *Strickland*, 575 F.Supp. 1111. Other courts have examined the issue under Fed.R.Evid. 403 and have excluded such evidence as unduly prejudicial. *See Ledford v. Rapid–American Corp.*, 47 Fair Empl.Prac.Cas. (BNA) 312, 313, 1988 WL 3428 (S.D.N.Y.1988); *Coffin v. South Carolina Department of Social Servs.*, 562 F.Supp. 579, 591 (D.S.C.1983).

The Third Circuit, however, has held that the admissibility decision is to be made by the trial court in the exercise of its discretion. *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir.1977). In exercising its discretion, this Court will admit the Woodson Report into evidence. The Court believes that the probative value of the report outweighs its prejudicial effect. While EEOC letters of determination or similar state-issued reports may be excluded in situations where the administrative decision has been shown to be particularly untrustworthy, *see Abrams*, 702 F.Supp. at 512 (citing Fed. R.Evid. 803(8)(C); *Johnson v. Yellow Freight System, Inc.*, 734 F.2d 1304, 1309–10 (8th Cir.), *cert. denied*, 469 U.S. 1041, 105 S.Ct. 525, 83 L.Ed.2d 413 (1984)), in the instant matter, no such showing of untrustworthiness has been made.

While this Court has chosen to admit the Woodson Report, it should be noted that this Court has made its own independent determination of the facts, based upon the testimony and evidence adduced at trial, and has found them to be consistent with the Woodson Report.

Plaintiff's Title VII Claim.

■ The Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), set forth the standard for allocating proof in a Title VII case alleging discriminatory treatment. The Court again outlined that test in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In *Burdine*, the Court summarized the holding in *McDonnell Douglas*:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination

*Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093 (citations omitted). The Court, however, went on to explain that, although intermediate evidentiary burdens exist, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1093.

■ In order to establish employment discrimination, it must be shown that the employer bore a racially discriminatory animus against the employee, and that this animus manifested itself in some challenged action, whether it be dismissal, failure to promote, failure to hire, or that the employee was subjected to what has been categorized as a "hostile work environment." *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

■ In the instant action, plaintiff has argued that DHS treated her in a discriminatory manner because of her race. Therefore plaintiff has proceeded under a disparate treatment theory of Title VII liability.

The disparate treatment theory must be distinguished from a disparate impact theory of liability. Disparate treatment applies where an employer has treated an individual less favorably than another because of his or her race, color, religion, sex, or national origin. *Id.* at 334–43, 97 S.Ct. at 1854–58. In a disparate treatment case, the plaintiff bears the ultimate burden of persuading the jury that her treatment was "caused by purposeful or intentional discrimination." *Massarsky v. General Motors Corp.*, 706 F.2d 111, 117 (3d Cir.) (citations omitted) (citing *Smithers v. Bailar*, 629 F.2d 892, 898 (3d Cir.1980)), *cert. denied*, 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

■ A disparate impact theory, on the other hand, applies where the employer's adverse action resulted not from any discriminatory motive but simply from application of certain facially neutral criteria that allegedly impact disproportionately upon members of a protected class and which cannot be justified by business necessity. *Id.* (citing *Dothard v. Rawlinson*, 433 U.S. 321, 329, 97 S.Ct. 2720, 2726–27, 53 L.Ed.2d 786 (1979)) (citations omitted).

A. Hostile Work Environment.

■ The cause of action for hostile work environment was first recognized by the Fifth Circuit in *Rogers v. EEOC*, 454 F.2d 234 (5th Cir.1971), *cert. denied*, 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972). That case was decided under Section 703 of Title VII, 42 U.S.C. § 2000e–2(a) which provides, in relevant part, that an employer may not "discriminate against any individual with respect to ... terms, conditions or privileges of employment, because of such individual's race." *Id.* The phrase "terms, conditions or privileges of employment" in Title VII has been recognized as an "expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination." *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (quoting *Rogers*, 454 F.2d at 238). Title VII therefore, provides employees with the "right to work in an environment free from discriminatory intimidation, ridicule, and insult." *Kishaba v. Hilton Hotels Corp.*, 737 F.Supp. 549 (D.Haw.1990) (quoting *Meritor Savings Bank*, 477 U.S. at 66, 106 S.Ct. at 2405).

■ It is now well established that a working environment overrun by racial antagonism constitutes a Title VII violation. *See, e.g., Risinger v. Ohio Bureau of Workers' Compensation*, 883 F.2d 475 (6th Cir.1989), *reh'g denied* (6th Cir.1990); *Snell v. Suffolk County*, 782 F.2d 1094 (2nd Cir.1986); *Gilbert v. City of Little Rock*, 722 F.2d 1390 (8th Cir.1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347, 80 L.Ed.2d 820 (1984); *Walker v. Ford Motor Co.*, 684 F.2d 1355 (11th Cir.1982); *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981). However, the courts which have examined the theory of hostile work environment in the context of Title VII have not proceeded using the analysis outlined in *McDonnell Douglas*. It has been found that "an employer violates Title VII simply by creating or condoning an environment at the workplace which significantly and adversely affects [the psychological well-being] of an employee because of his race or ethnicity, regardless of any other tangible job detriment to the employee." *Walker*, 684 F.2d at 1358 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir.1982)) (citations omitted) (bracketed phrase in original text). However, it must be recognized that in order to establish a hostile atmosphere, a plaintiff must prove more than a few isolated incidents of racial enmity. Mere casual comments or accidental or sporadic conversation will normally not trigger the protections offered under Title VII. *Snell*, 782 F.2d at 1103 (citations omitted). Rather, the alleged harassment "must be sufficiently pervasive so as to alter the conditions of employment and create an abusive working environment." *Walker*, 684 F.2d at 1359 (quoting *Henson*, 682 F.2d at 904). Whether the racial acrimony which exists in a particular institution is sufficient to constitute a Title VII violation is to be determined from the totality of the circum-

stances. *Snell*, 782 F.2d at 1103 (citation omitted).

For example, in *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87 (8th Cir.1977) (per curiam), the court found that the use of ethnic slurs by a supervisor were not sufficient to constitute a Title VII violation. In *Cariddi*, the plaintiff, a former employee hired to supervise ticket takers, sued for damages for a stadium director's references to him as a "dago." The director further referred to other Italian–American employees as "mafia." The district court found that the comments were merely part of casual conversation and were not so numerous as to rise to a Title VII violation. The Eighth Circuit affirmed, holding that the findings were not clearly erroneous. *Id.*

The Eighth Circuit again addressed the issue of a racially hostile working environment in *Johnson*, 646 F.2d 1250. The court noted: "Unquestionably, a working environment dominated by racial slurs constitutes a violation of Title VII." *Id.* at 1257. The court stated that a claim for hostile working environment depends on the degree of harassment. The Eighth Circuit concluded that despite testimony by plaintiffs that supervisors and fellow employees often referred to them as "niggers," the plant manager stated that he never heard any such references and would have reprimanded those responsible. *Id.* The court held that the use of racial slurs, if any, "was infrequent, was limited to casual conversation among employees, and with possible rare exceptions was not directed toward appellants." *Id.*

However, in *Walker*, 684 F.2d 1355, the Eleventh Circuit affirmed the trial court's finding that defendant's continued use of racial slurs over a seven month period was sufficiently pervasive to rise to a violation of Title VII. Appellant Walker had entered a minority dealer training program instituted by the Ford Motor Co. and administered through participating local dealerships. Walker, on numerous occasions, complained to Ford that management and employees of the Northgate Lincoln–Mercury dealership, where he was training, repeatedly used offensive racial epithets, including referring to poorly repaired cars as "nigger-rigged" and referring to the salesman with the lowest sales volume as "the black ass." The district court found that Northgate personnel's use of these terms as well as other racially abusive language was repeated, continuous and prolonged and therefore violated Title VII. The Eleventh Circuit affirmed.

While the Third Circuit has not addressed a cause of action based upon a racially hostile work environment theory under Title VII, the Circuit has examined such a Title VII claim based upon a sex discrimination. The law is the same under both scenarios. *See Meritor*, 477 U.S. at 66, 106 S.Ct. at 2405.

In examining a claim of a hostile work environment, the Third Circuit noted:

> [W]hile Title VII does not require that an employer fire all "Archie Bunkers" in its employ, the law does require that an employer take prompt action to prevent such bigots from expressing their opinion in a way that abuses or offends their co-workers. By informing people that the expression of racist or sexist attitudes in public is unacceptable, people may eventually learn that such views are undesirable in private, as well. Thus, Title VII may advance the goal of eliminating prejudices and biases in our society.

*Andrews v. City of Philadelphia*, 895 F.2d 1469, 1486 (3d Cir.1990) (quoting *Davis v. Monsanto Chem. Co.*, 858 F.2d 345, 350 (6th Cir.1988)) (sexually hostile work environment claim under Title VII).

The Circuit held that five constituents must converge to bring a successful claim for a hostile work environment under Title VII:

> (1) the employees suffered intentional discrimination because of their sex [or race]; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same

sex [or race] in that position; and (5) the existence of respondeat superior liability. *Id.* at 1482.

In applying these factors to the instant claim, it becomes clear that DHS promoted or condoned a racially hostile work environment which significantly and adversely affected the psychological well-being of plaintiff because of her race. *Walker,* 684 F.2d at 1358 (citation omitted).

The repeated racial incidents which occurred during plaintiff's employment at DHS were clearly intentional. Even if one were to accept the argument that many of the verbal assaults on blacks were conversational and not directed at plaintiff, the attack on plaintiff's locker cannot be construed to be anything other than intentional racial discrimination. Moreover, the fact that many of the racial epithets and incidents were not expressly directed at plaintiff is not determinative. *Id.* at 1359 (citation omitted). The offensive language not expressly directed at plaintiff was often used in her presence. Furthermore, the abusive graffiti on Willis' locker and in the men's restroom, while also not directed towards the plaintiff, were committed in areas where plaintiff had ready and regular access. The fact that DHS took four months from the time they were notified to paint over the graffiti in the restroom is telling of DHS' tolerance of racial discrimination.

With respect to the second factor, the Third Circuit has noted that harassment is pervasive and regular "when incidents of harassment occur either in concert or with regularity." *See Andrews,* 895 F.2d at 1484 (quoting *Lopez v. S.B. Thomas, Inc.,* 831 F.2d 1184, 1189 (2nd Cir.1987)). The DHS police officer's repeated use of racial slurs, the incidents involving both plaintiff's and Willis' locker, as well as the graffiti which appeared on the restroom wall represent repeated racial abuse. While some of the verbal assaults were limited to casual conversation, a number were not. Furthermore, the racial incidents were not accidental, sporadic or limited to a few isolated acts. In viewing the totality of the circumstances, the environ-

ment at Marlboro was ridden with racial acrimony. The incidence of racial discord was repeated, continuous and occurred for almost one year. It was therefore sufficiently pervasive and regular so as to alter the conditions of employment and to create an abusive working environment. *Walker,* 684 F.2d at 1359.

Similarly, the abusive working environment which existed during plaintiff's employment with DHS, detrimentally affected plaintiff. The repeated racial attacks against plaintiff and Willis and the intolerable conditions which plaintiff was forced to work in once she was transferred to Brisbane, caused plaintiff to resign. DHS' reassignment of plaintiff followed by its indifference and neglect had the effect of punishing the victim of discrimination.

The fourth factor, whether the discrimination would detrimentally affect a reasonable person of the same race in that position, is an objective factor. Congress designed Title VII to prevent the perpetuation of stereotypes and degradation. Such conditions serve to discourage or even close employment opportunities for blacks and other protected groups. *See Andrews,* 895 F.2d at 1483. Congress expected that Title VII would result in the "removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *Id.* (quoting *Griggs v. Duke Power,* 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971)). Congress' objective can only be accomplished if blacks and other protected groups are permitted to work without being harassed. If such conditions are permitted to exist, blacks and others who know that they will be subject to harassment will be deterred or even prevented from participating in the workforce. *Id.*

In considering whether there was a hostile work environment, one must not consider individual incidents in isolation, but rather must look at the overall scenario, considering not only the frequency of the offending conduct but also its gravity. *Id.* While some of the incidents

of racial acrimony which existed at DHS might be dismissed as casual conversation, the attacks on plaintiff's and Willis' lockers, as well as the graffiti on the bathroom walls cannot be taken lightly. The mere mention of the KKK invokes a long and violent history sufficient to detrimentally affect *any* reasonable person of the same race as the plaintiff.

In examining the final factor in a hostile work environment claim, respondeat superior, one must look to agency principles for guidance. According to these principles "liability exists where the defendant knew or should have known of the harassment and failed to take prompt remedial action." *Id.* at 1486 (quoting *Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.), *reh'g denied en banc,* 874 F.2d 821 (1989)). Brennan admitted that in only two instances were officers punished for their racially motivated actions. Neither employee was fired, and it appears that both received nothing more than a slap on the wrist. DHS sent no affirmative message that race discrimination would not be tolerated while plaintiff was employed by DHS, nor were employees exposed to any kind of training while at DHS to cure the obvious racial problems which existed there. The so called investigation prompted by plaintiff's complaints appears to have been perfunctory and dilatory at best. What is most appalling is that the most serious of the incidents directed at the plaintiff, the defacement of her locker, was investigated as a mere act of vandalism rather than an incident of racial aggression. In an environment where management's awareness of numerous other racial incidents and inaction could only be read by the perpetrators as tacit approval or at least unwillingness to take effective action, DHS' belated investigation was wholly inappropriate and inadequate. Furthermore, DHS assigned the criminal investigation directly to the department that was implicated in the act, rather than employing an independent body to conduct the investigation. While DHS did circulate a memorandum condemning acts of discrimination, the memorandum was circulated nearly two months after plaintiff had

resigned. DHS was on notice of the severity of the racial problems which existed at Marlboro over seven months before the memorandum was distributed.

Therefore, given the hostile nature of the environment at Marlboro and DHS' failure to take any reasonable steps to cure the situation, this Court must find that the hostile work atmosphere at DHS violated Title VII.

### B. Constructive Discharge.

In *McDonnell Douglas,* the Court noted that the facts necessary to establish a prima facie case of racial discrimination are flexible in Title VII cases, and will vary to reflect the differing circumstances of each situation. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. In order to establish a prima facie case of race discrimination in a constructive discharge claim, plaintiff must show that (i) she belongs to a protected class; (ii) she was qualified for the position she held and was performing it satisfactorily; (iii) despite her qualifications she was constructively discharged; and (iv) she was discharged while other employees not in her protected class were retained. *McWilliams v. Western Pennsylvania Hospital,* 717 F.Supp. 351, 354 (W.D.Pa.1989) (citations omitted).

There is little question that plaintiff has adequately established three of the four elements necessary to establish her prima facie case. Because she is black, plaintiff is a member of a protected class. Plaintiff was trained and qualified as a provisional police officer and adequately performed her duties for nearly two years, therefore, the second element is satisfied. Plaintiff has also adequately established the fourth element since plaintiff left her position as a provisional police officer while other similarly situated employees not in her protected class were retained. Our focus, therefore, is on the third element, that of constructive discharge.

The constructive discharge doctrine was first examined in the context of the National Labor Relations Act. *See, e.g., NLRB v. Tricor Products, Inc.,* 636 F.2d 266, 271 (10th Cir.1980). Since that

time, the application of the doctrine to Title VII cases has received almost universal recognition by the courts which have addressed the question. The Third Circuit has held that constructive discharge claims under Title VII require acts of discrimination in violation of Title VII, *Goss v. Exxon Office Systems Co.*, 747 F.2d 885, 887 (3d Cir.1984), and that such a discharge may be found if an "employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Id.* at 888. Therefore, the discriminatory conduct must be associated in some fashion with the intolerable atmosphere leading to the constructive discharge. *McWilliams*, 717 F.Supp. at 354.

The Ninth Circuit has held that a single isolated instance of employment discrimination is insufficient as a matter of law to support a finding of constructive discharge. A plaintiff alleging a constructive discharge must show some " 'aggravating factors,' such as a 'continuous pattern of discriminatory treatment.' " *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir.1987) (quoting *Satterwhite v. Smith*, 744 F.2d 1380, 1382 (9th Cir.1984)) (citation omitted).

In light of this Court's finding of a hostile working environment, there is little question that the employment discrimination complained of amounted to a continuous pattern of discriminatory conduct in violation of Title VII. Moreover, DHS knowingly permitted these intolerable conditions to persist and failed to implement any policy to discourage the situation until well after plaintiff resigned. The only tangible action DHS took to prevent the discrimination against plaintiff was to temporarily transfer her to Brisbane, "for her own safety", while the "investigation" languished for four months. However, even this act was inadequate in light of the severity of the problem. While there were no complaints of discrimination at Brisbane, DHS had effectively banished plaintiff to an out of the way post, alone, where she was provided with inadequate equipment and support to effectively perform her job. DHS furthermore made no dis-

cernable efforts to quiet the acts of discrimination at Marlboro in the nearly four months that plaintiff was assigned to Brisbane. In fact, DHS telephoned plaintiff at Brisbane and stated that the investigation was complete and she had nothing to worry about. Plaintiff was told that her problems resulted from her friendship with Willis. No one was ever seriously punished for the discriminatory acts nor was any policy outlined to prevent any further acts of discrimination at Marlboro. DHS had essentially swept the problem under the rug and banished plaintiff to Brisbane. For purposes of Title VII law, DHS sent the message that any "troublemaker" who persisted in complaining about racial discrimination would be exiled. Thus this Court finds that plaintiff's "transfer" to Brisbane was merely another piece of the intolerable discriminatory atmosphere created by DHS and that any reasonable person subject to these conditions would be forced to resign. Given that DHS has failed to adequately rebut plaintiff's prima facie case this Court finds that plaintiff was constructively discharged from her position as a provisional police officer for DHS.

### C. Damages.

Because this Court has found discrimination under Title VII of the Civil Rights Act of 1964, plaintiff becomes entitled to an appropriate remedy under 42 U.S.C. § 2000e–5. The statute provides that "the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement ... with or without back pay ..., or any other equitable relief as the court deems appropriate. *Id.* However, "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." *Id.* Under the statute the district court may also grant reasonable attorney's fees and costs as part of the award. *Id.*, § 2000e–5(k).

Under Title VII, the victims of discrimination are entitled, where possible, to be restored to the economic position that they would have occupied but for the intervening unlawful conduct of the employer. *Rodriguez v. Taylor,* 569 F.2d 1231, 1238 (3d Cir.1977) (citing *Franks v. Bowman Transp. Co.,* 424 U.S. 747, 763–64, 96 S.Ct. 1251, 1263–64, 47 L.Ed.2d 444 (1976)), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Defendant is therefore directed to reinstate plaintiff to the economic position that she would have held but for the unlawful discrimination.

The Third Circuit has held that back pay awards in Title VII cases are limited to two years. *Bereda v. Pickering Creek Indus. Park, Inc.,* 865 F.2d 49, 54 (3d Cir.1989). Therefore, defendant is directed to pay plaintiff back pay for a period of two years from the time of her discharge, less any mitigation. Defendant has argued because plaintiff voluntarily left a position with a pharmacy that she secured after her discharge from DHS, that such an act constituted an intervening event serving to diminish any award she might recover. Plaintiff asserted that she had to leave the job due to transportation problems. This Court does not find defendant's argument persuasive and, therefore, the earnings plaintiff would have earned at the pharmacy will not be applied against her award of back pay.

Defendant is further directed to pay plaintiff's reasonable attorney's fees and costs. However, plaintiff's prayer for punitive damages is denied. The Third Circuit has held that such damages are not available under Title VII. *See Protos v. Volkswagen of America, Inc.,* 797 F.2d 129, 138 (3d Cir.), *cert. denied,* 479 U.S. 972, 107 S.Ct. 474, 93 L.Ed.2d 418 (1986). With respect to the injunctive relief sought by plaintiff, since defendant has implemented a policy to discourage discrimination which took effect after her discharge and because there is no evidence in the record to suggest that the discriminatory conditions which existed during plaintiff's employ have continued since her discharge, plaintiff's prayer for such relief is denied.

However, should such discriminatory conditions continue once plaintiff resumes her duties at DHS, plaintiff may file another lawsuit.

The parties are directed to submit a judgment consistent with this opinion. If the parties are unable to agree on an award of attorney's fees and costs, counsel for plaintiff may submit a petition to the Court. Such a petition should describe with specificity the task for which payment is being sought and include documentation for all costs.

For the reasons stated above,

It is on this 10th day of July, 1991,

ORDERED that judgment be and is hereby entered in favor of the plaintiff.