Charles BARCELONA, Plaintiff,

v.

FOX GROCERY COMPANY EMPLOY-EES' PENSION PLAN, Fox Grocery Company, a corporation, Union National Bank of Pittsburgh, Trustee, Edward A. Savarno, Trustee, Defendants.

Civ. A. No. 79–737.

United States District Court, W. D. Pennsylvania.

Jan. 2, 1980.

OPINION

SNYDER, District Judge.

Charles Barcelona brings suit under the Employees Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*, to recover pension benefits under a post-ERISA pension plan. Before .the Court are Cross Motions for Summary Judgment. The Defendants' Motion will be granted and the Plaintiff's Motion will be denied.

I.

Barcelona began his employment with Fox Grocery (Fox) on July 20, 1958; he became a participant in the Defendant Fox Grocery Company Employees' Pension Plan on December 12, 1965. Later, when the parties came to a parting of the ways they entered into an agreement which provided in full:

"AGREEMENT

This Agreement is being made between Charles B. Barcelona, hereinafter referred to as the Employee, and Fox Grocery Company, hereinafter referred to as the Employer. Due to a difference of opinion concerning Corporate Policy between the Employee and the Employer, and in consideration of the Employee's years of service, the Employer hereby agrees to grant the Employee 12 months leave of absence with pay, effective Dec. 31, 1975, with the understanding that the Employee hereby agrees not to work in any business, activity or endeavor that is or will be competitive to those activities or businesses currently engaged in by the Employer.

This restriction applies only to the geographical area currently designated as the official franchise territory granted by Foodland International Corporation to the Fox Grocery Company, Belle Vernon, Pennsylvania and Service Wholesale Company, Culloden, West Virginia.

This restriction is to extend for a period not to exceed four (4) years from this date.

Ralph Hardesty, Jaeckle, Fleischmann & Mugel, Buffalo, N. Y., for plaintiff.

Thomas E. Lippard, Houston, Cohen, Harbaugh & Lippard, Pittsburgh, Pa., for defendants.

The Parties recognize that this Agreement not to compete is in consideration for the salary paid for the aforesaid leave of absence.

Both Parties agree that this Agreement is enforceable by injunction in equity.

Signed this 2nd day of December, 1975.

/s/ Charles B. Barcelona    /s/ John F. Fox
Employee         Fox Grocery Company"

Under the pension plan in effect on the effective date of the agreement (Plan I), a participant whose employment was terminated for reasons other than death or retirement had limited rights, i. e., to the cash value of the life insurance or annuity contracts purchased by the Trustee for the participant. See § 5.01 of Plan I.[1]

Effective December 28, 1976, Plan I was amended to bring it into compliance with ERISA. Under the amended plan (Plan II), even though a participant terminated his employment prior to retirement, he earned a vested and non-forfeitable interest in his accrued benefit, based on his years of credited service. See §§ 5.01(d) [2] and 7.03 of Plan II.[3] A participant with fifteen years

**1.** § 5.01 of Plan I provides:
"Termination of Employment: If a Participant shall cease to be an employee for any reason except death, retirement on the Normal Retirement Date, or earlier or later retirement or disability as provided in Sections 3 and 4, his interest and rights in this Trust shall be the cash value of the Policy. The Policy shall be assigned to the terminated participant free and clear of the Trust as of his termination."

**2.** § 5.01(d) of Plan II provides:
"Deferred Vested Benefits: If a Participant terminates his employment prior to becoming eligible for Early Retirement Benefits but after being credited with a sufficient number of years of Credited Service to be entitled to a Vested Benefit under the provisions of Section 7.03 he shall be entitled to receive a benefit equal to the vested portion of his Accrued Benefit. The form of benefit and the time of commencement shall be governed by the provisions of Section 8."

**3.** § 7.03 of Plan II provides:
"Other Termination: Upon the termination of a Participant's employment with the Employer for any reason other than death, disability or retirement on or after his Normal Retirement Date, such Participant shall be vested in his Accrued Benefit in accordance with the following vesting schedule:

or more credited service had a 100 per cent vested interest.

Under his agreement, Barcelona continued to receive his salary through December 31, 1976, three days after Plan II went into effect, without performing any services for Fox since December 31, 1975. Payments were then terminated. He now brings action for benefits under Plan II.

## II.

The Defendants look to Plan I. They argue that the leave of absence created a break in credited service under § 2.03 [4] of Plan I, rendering Plaintiff a non-participant in Plan I as of the effective date of Plan II. Thus, Barcelona must be considered a new employee under Plan II which requires that new employees complete one year of service to become a participant, under the Defendants' theory. They offer the Plaintiff his interests as determined under Plan I.

Barcelona contends he was a Fox employee on December 28, 1976 because a leave of absence does not constitute a termination of

| Years of Credited Service | Vested Percentage |
|---|---|
| less than 5 | 0% |
| 5 but less than 6 | 25% |
| 6 but less than 7 | 30% |
| 7 but less than 8 | 35% |
| 8 but less than 9 | 40% |
| 9 but less than 10 | 45% |
| 10 but less than 11 | 50% |
| 11 but less than 12 | 60% |
| 12 but less than 13 | 70% |
| 13 but less than 14 | 80% |
| 14 but less than 15 | 90% |
| 15 or more | 100%" |

**4.** § 2.03 of Plan I provides:
"Break In Full-time Credited Service: An employee whose full-time Credited Service has been severed and later resumed shall be deemed a new employee as of the date of his resumption of full-time Credited Service. The total of the pension benefit calculated as if he were a new employee at the date of resumption of full-time Credited Service, plus any amounts of pension to which he has a vested right at the time of his prior severance of employment, shall not exceed the pension benefits specified in Section 3."

employment. Barcelona points to the December 2, 1975 agreement as being only a leave of absence.

### III.

The standards for summary judgment, as offered in *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3rd Cir. 1976), *cert. denied* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977), are:

"Rule 56 [F.R.Civ.P.] allows the trial court to grant summary judgment if it determines from its examination of the allegations in the pleadings and any other evidential source available that no genuine issue as to a material fact remains for trial, and that the moving party is entitled to judgment as a matter of law."

The filing of cross motions for summary judgment does not alter the rule.

" 'The well-settled rule is that cross-motions for summary judgment do not warrant the court in granting summary judgment unless one of the moving parties is entitled to judgment as a matter of law upon facts that are not genuinely disputed.' "

*Heyman v. Commerce and Industry Insurance Co.*, 524 F.2d 1317, 1320 (2nd Cir. 1975).

■ The interpretation of a written contract that is clear and unambiguous is for the court. *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265 (3rd Cir. 1979), and thus can be disposed of on a motion for summary judgment. However, " 'Where contractual language is susceptible of at least two fairly reasonable interpretations, this presents a triable issue of fact, and summary judgment would be improper.' " *Heyman v. Commerce and Industry Insurance Co., supra,* cited with approval in *Landtect Corp. v. State Mutual Life Assurance Co.*, 605 F.2d 75, 79 (3rd Cir. 1979).

We therefore turn now to the provisions of the pension plans to determine entitlement to benefits. Barcelona claims rights under Plan II. This Plan sets out eligibility requirements in § 3.01 as being:

"Each employee of the employer who is a Participant in the Plan on the effective date of this amendment [December 28, 1976] shall continue to participate subject to the terms and conditions of the amended Plan."

Thus, the two prerequisites for participation in Plan II are that the individual be an employee on the effective date of Plan II, and that the individual be a participant in Plan I. Since Plan I was in existence on January 1, 1974, ERISA's participation and vesting standards do not apply.[5]

The first requirement is that the individual be an employee under Plan II. Employee is defined in § 2.07 of Plan II as "each individual employed by an Employer, while he is so employed". However, at § 2.09(a)(ii), "hours of service" is defined to include hours "for which an Employee is paid, or entitled to payment, by the Employer on account of a period of time during which no duties are performed (*irrespective of whether the employment relationship has terminated*) due to vacation, holiday, illness, incapacity (including disability), lay off, jury duty, military duty or leave of absence." (Emphasis added).

Because of the difficulty in construing the term "employee", we will limit our discussion to the second requirement, that the individual be a participant in Plan I as of December 28, 1976. "Participant" is defined in § 1.14 of Plan I as "any employee of the Employer who participates in the Plan." We hold that as the terms are used in Plan I, Barcelona was not an employee, nor was he participating in the Plan, as of December 28, 1976. Consequently, he does not qualify as a participant in Plan II and has no rights thereunder.

### IV.

Plan I does not contain a special definition of "employee" in its "Section 1 Defini-

---

5. Since ERISA was expressly made prospective only and allowed a grace period for existing plans, ERISA's participation and vesting standards do not apply to a pension plan which was existing on January 1, 1974, until the employer's first plan year after December 31, 1975. *Schlansky v. United Merchants & Manufacturers Inc.*, 443 F.Supp. 1054 (S.D.N.Y.1977).

**1132**

tions". However, at § 5.01, the Plan provides:

> "Termination of Employment. If a Participant shall cease to be an employee for any reason except death, retirement on Normal Retirement Date, or earlier or later retirement or disability as provided in Sections 3 and 4, his interest and rights in this Trust shall be the cash value of the Policy. The Policy shall be assigned to the terminated Participant free and clear of the Trust as of his termination."

Under this provision, once an employee terminates his employment relationship (for a reason other than retirement or death), he is no longer a participant in the Plan. The critical question then is whether this employment relationship was severed as of December 31, 1975, when Barcelona went on his leave of absence. We conclude that it was.

Barcelona argues that his employment status with Fox was expressly defined as a leave of absence and the Court must so construe it, *i. e.*, that the intent must be determined from that document alone. *See Plymouth Mutual Life Insurance Co. v. Illinois Mid-Continental Life Insurance Co.*, 378 F.2d 389 (3rd Cir. 1967). This however does not avail.

■ Reading the December 2, 1975 agreement between Barcelona and Fox as a whole, Fox granted Barcelona "12 months leave of absence with Pay". While a leave of absence generally connotes a temporary suspension in employment duties, something less than a complete separation from employment, *see, e. g., Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 287, 66 S.Ct. 1105, 90 L.Ed. 1230, 1241 (1945); *Chenault v. Otis Engineering Co.*, 423 S.W.2d 377 (Tex.Civ.App.1967); *Bowers v. American Bridge Co.*, 43 N.J.Super. 48, 127 A.2d 580 (1956), the phrases "due to a difference of opinion concerning corporate policy" and "in consideration of the employee's years of service" in the same sentence are indicative of termination of employment,

not suspension of performance of duties. The same is true of the remainder of this agreement setting forth a covenant not to compete with Fox for the next four years.

Plaintiff argues that the agreement must be construed against Fox, the draftsman. *See In re F. H. McGraw & Co.*, 473 F.2d 465 (3rd Cir. 1973). However, the rule stated by Plaintiff is applicable only to a limited extent. "A rule for construing contracts against the author is not an alternative to construing the contract as the parties intended. It is to be applied after the court has inquired into the intent of the parties, and then only if its meaning remains uncertain." *Board of Trade of San Francisco v. Swiss Credit Bank*, 597 F.2d 146 (9th Cir. 1979); *Burns Manufacturing Co. v. Boehm*, 467 Pa. 307, 356 A.2d 763 (1976) (applying Pennsylvania law).[6]

In light of the affidavits submitted and the parties' subsequent actions, the Court finds no material dispute of fact regarding the intent of the parties in drafting and executing the leave of absence agreement— Barcelona's employment was terminated as of December 31, 1975.

■ The interpretation that the parties themselves give a contract, as. manifested by their conduct subsequent to formation is most important. *Cordingley v. Allied Van Lines, Inc.*, 563 F.2d 960 (9th Cir. 1977); *Capitol Bus Co. v. Blue Bird Coach Lines, Inc.*, 478 F.2d 556 (3rd Cir. 1973). Barcelona points to his continued treatment as an employee of Fox throughout 1976--he received his regular salary, his dental and health insurances were kept in force and he continued to participate in the stock ownership plan. This is not persuasive for as the Court of Appeals for the Third Circuit has made clear, continued receipt of employee benefits after the employee has ceased working does not necessarily extend the employment relationship. *See Bonham v. Dresser Industries, Inc.*, 569 F.2d 187 (3rd Cir. 1977) (unlawful discharge occurs when employee is given unequivocal notice of ter-

---

**6.** We are not here interpreting a pension plan agreement, but a leave of absence agreement which indirectly affects pension rights. Thus, the Pennsylvania cases cited by the Plaintiff, *e. g. Levitt v. Billy Penn Corp.*, 219 Pa.Super. 499, 283 A.2d 873 (1971), are inapposite.

mination and ceases work, not when employer ceases paying benefits), cert. denied 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978).

What we do find significant is that at the end of this 12 month leave of absence, all ties between Fox and Barcelona were severed. It is thus clear that the leave of absence with pay was not to be temporary, but, rather, was the manner in which Barcelona's severance pay was to be handled. The Affidavit of John Fox, President of Fox Grocery, contains the following statements:

"1. . . . Plaintiff's employment was terminated by defendant Fox effective December 30, 1975 . . ..

2. In deference to plaintiff's years of service . . . defendant Fox agreed to temper the effects of plaintiff's preemptory termination by providing for twelve (12) months 'leave of absence' pay to him. The agreement . . . was drafted by [Fox] in the presence of plaintiff to accomplish this objective.

3. [Fox] at all material times was the chief executive officer of defendant Fox and had personally nurtured plaintiff through the latter's employment with defendant Fox.

4. In the context of the personal relationship described, [Fox] clearly and unequivocally advised plaintiff that plaintiff's status as an employee of defendant Fox was terminated effective December 30, 1975. Plaintiff acknowledged this fact verbally and by his signature to the Agreement of December 2, 1975.

5. At the same time, i. e., December 2, 1975, [Fox] forthrightly advised plaintiff that defendant Fox would provide him twelve (12) months severance pay—termed 'leave of absence with pay' for no particular reason—to temper the potential harshness of his precipitous discharge."

Barcelona never disputes the factual allegations, only the legal conclusions. In his first affidavit (given before Fox's affidavit), Barcelona stated:

"5. However, my employment terminated on December 31, 1976, which I can prove entirely by documentary evidence and undisputable facts. My employment having terminated at the end of 1976, the benefits owed to me are governed by the 'new' Plan which took effect as of December 28, 1976. . . . The 'new' Plan is, of course, subject to the mandates of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 et seq. Under the terms of the Plan, as required by law, I am entitled to a nonforfeitable interest in the entire amount of my accrued benefit under the Plan.

6. In December of 1975, Mr. John Fox, the President of defendant Fox, consulted an attorney who drafted an Agreement giving me a 12-month leave of absence with pay from my job with Fox commencing on December 31, 1975. . . That Agreement was executed by John Fox and myself on December 2, 1975, and I began the leave of absence on December 31, 1975.

7. During the entire year of 1976, I continued to receive my regular compensation at the regularly scheduled times. Fox withheld federal, state and city income taxes from the paychecks and at the end of the year a Form W–2 Wage and State Tax Statement was issued by Fox.

. . .

8. During the entire year of 1976, as an employee of Fox, my group health insurance through Fox was to continue as was my group dental coverage. In November of 1976, I was hospitalized, and, Fox's carrier, Blue Cross-Blue Shield of Pennsylvania, paid my claim. . . ."

In his second affidavit, Barcelona attacks John Fox's affidavit on the basis that it consists entirely of inadmissible parol evidence. Otherwise, in Paragraph 3, he states:

"[T]here is certainly no question that I do not agree with Mr. Fox's allegations. Of course we intended to say what we said in the leave of absence agreement. . . This is clearly substantiated by all of the

documentary evidence reflecting the past acts of the parties."

And, in Paragraph 7, he states:

"In conclusion, the 'facts' in the Fox affidavit are not true, not relevant, not admissible and not supportive of a motion for summary judgment."

■ Affidavits with conclusory statements and general denials are insufficient to create a genuine factual dispute. *Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141 (3rd Cir. 1972). *See also Citizens Environmental Council v. Volpe,* 484 F.2d 870 (10th Cir. 1973).

John Fox avers he informed Barcelona that he (Barcelona) was terminated as of December 30, 1975 and that the leave of absence with pay was severance pay. Barcelona responds by stating "we intended to say what we said in the leave of absence agreement", generally denying Fox's allegations. However, Barcelona was not denying that John Fox made such statements. Barcelona's affidavit attempted to rely on documentary evidence to establish that he was not terminated, but offered nothing as to what was said or understood at the time the leave of absence agreement was drafted and executed.

According to John Fox's affidavit, Barcelona knew he was terminated as of December 30, 1975, and Barcelona's affidavits are not sufficient to create a genuine factual dispute regarding this matter. Since the parties terminated the employment relationship on December 30, 1975, Barcelona was not a participant of Plan I, under § 5.01 of Plan I, on December 28, 1976, and thus is not entitled to benefits under Plan II.

## V.

■ As we focus on Section 2 of Plan I which explains participation (there is no separate definition of participation in § 1, Definitions), we find that §§ 2.01 and 2.02 define eligibility for participation (there is no dispute that Barcelona was eligible to participate in Plan I).

Section 2.03 of Plan I provides:

"Break in full-time Credited Service: An employee whose full-time Credited Service has been severed and later resumed shall be deemed a new employee as of the date of his resumption of full-time Credited Service. The total of the pension benefit calculated as if he were a new employee at the date of resumption of full-time Credited Service, plus any amounts of pension to which he has a vested right at the time of his prior severance of employment, shall not exceed the pension benefits specified in Section 3."

Credited Service is defined in Plan I at § 1.07:

" 'Credited Service' means continuous full-time employment with any Employer a party to the Plan, including (i) approved leave of absence for sickness or education not to exceed two (2) years; and (ii) active service in the armed forces of the United States, the Government of the United States, or the Public Health Service . . .."

Full-time is defined in Plan I at § 1.09:

" 'Full-time' employment means customary employment for more than twenty (20) hours per week and for more than five (5) months per year."

The definition of credited service excludes leaves of absence for reasons other than sickness or education. Barcelona's leave of absence, not being for sickness or education, constituted a break in credited service. We, therefore, return to § 2.03 of Plan I, "Break in Credited Service". The effect of this subsection is, we believe, to render an employee a non-participant in the Plan for the period of the break in credited service. An employee who suffers a break in credited service has only a limited interest in the Plan, to whatever was vested *prior* to the break; he is deemed a new employee as of the date he *resumes* full-time credited service. Thus, for the period of the break, an employee accrues no benefit and does not participate in the Plan.

Barcelona, therefore, was not participating in Plan I on December 28, 1976, and, as

noted earlier, this prevented his participation in Plan II, except as a new employee (as a new employee he does not qualify). Consequently, Barcelona has no rights in Plan II.