**Suntok WAITE, Plaintiff,**

v.

**BLAIR, INC., Defendant.**

**Civil Action No. 93–186 ERIE.**

United States District Court,
W.D. Pennsylvania.

Jan. 20, 1995.

Peter G. Loftus, Peter G. Loftus, Scranton, PA, for plaintiff.

John Marti, Harper & Marti, Warren, PA, Joseph D. Luksch, Epstein, Becker & Green, New York City, for defendant.

## *MEMORANDUM OPINION*

McLAUGHLIN, District Judge.

## I. INTRODUCTION

Plaintiff Suntok Waite has filed a multi-count Complaint against Defendant Blair, Inc. ("Blair") alleging, inter alia, that Blair discriminated against her on the basis of her race and national origin in violation of the Civil Rights Act of 1964, Title VII, 42 U.S.C. § 2000(e), as amended, by subjecting her to a hostile work environment and by retaliating against her for activity protected under Title VII. Plaintiff also asserts a claim under the Americans with Disabilities Act of 1990, as well as several state law claims including alleged violation of the Pennsylvania Human Relations Act, wrongful discharge, and inten-

tional infliction of emotional distress.[1] Presently before the Court is Defendant's Motion for Summary Judgment on all of the foregoing counts. For the reasons discussed below, Defendant's motion is granted.

## II. BACKGROUND

In her brief opposing Defendant's motion for summary judgment, Plaintiff describes a litany of alleged harassment by Blair's employees and supervisory personnel which she claims were the product of ethnic, racial, and disability-related discrimination. Waite also claims that these incidents constitute extreme and outrageous conduct giving rise to her emotional distress claim. Because of the extensiveness of Plaintiff's allegations, the Court sets forth the relevant background in some detail.

Plaintiff is a native of Korea and has lived in the United States since November 28, 1965. (Deposition of Suntok Waite 5:2–25.) In September of 1979 she was hired by Blair as an inspector and remained in that position until her last day of work on October 1, 1992. (*Id.* at 10:10–15; 16:6–10; Complaint ¶¶ 7, 48.) Plaintiff was terminated by Blair on April 8, 1993 when she failed to return to work upon the expiration of her six-month disability leave period. (Complaint ¶ 49.)

Plaintiff maintains that she suffered a history of mistreatment while employed at Blair, particularly during the years 1987–1992. She claims, for example, that her assistant supervisor, Donald Rudolph, addressed her on many occasions stating "Yes, ma'am; no, ma'am," in a sarcastic tone. (Waite Deposition at 23:23–25; 24:3–9; 42:11–43:2.) Waite testified at deposition that, "He [Rudolph] bother me. Too much yes, ma'am, no ma'am. Too much. It both me. Really bother me." (*Id.* at 43:20–22.) On April 4, 1992, Rudolph addressed Plaintiff with the words "Yes sir" and "No sir," and commented to the effect that, with Plaintiff's short hair, it was difficult to distinguish her from a man. (*Id.* at 43:3–44:13.) Plaintiff had other complaints concerning Rudolph,

including the objection that "sometimes he says you, Mrs. Waite, good morning." (*Id.* at 24:22–23.)

On more than one occasion, Plaintiff met with John Carter, head of merchandise, and complained that Rudolph was saying "yes and no ma'am" to her constantly in a sarcastic manner, not in a manner of respect. (*Id.* at 44:14–46:20; 47:9–48:6.) During one such meeting, Plaintiff referred to some of her own handwritten notes (in Korean writing) concerning various incidents that she wished to discuss with Mr. Carter. Plaintiff apparently took offense to the fact that another co-worker who was present at the meeting, upon examining Plaintiff's notes, referred to the writing as "chicken scratch." (*Id.* at 46:13–47:4.) Plaintiff acknowledges that Carter agreed to talk to Plaintiff's co-workers about the complained-of conduct, but she claims that the insults did not stop. (*Id.* at 48:6–9.)

Waite also complains that her immediate supervisor, Jim McDunn, "yelled" at her on occasion. (*Id.* at 17:10–15.) For example, Plaintiff complains that on September 22, 1989 McDunn "yelled at her" for fighting with another employee and pushed a steel table in front of her, even though Plaintiff had done nothing but simply enter her work station. (*Id.* at 17:20–19:7.)

There were other complaints of co-workers yelling at Plaintiff, including Sue Arnold, who allegedly "yelled" at Waite in front of other people regarding the manner in which Waite had completed a company work report. (*Id.* at 63:24–65:14.) Plaintiff claims that McDunn confronted her following the yelling episode with Arnold, at which time McDunn kicked a box and told Plaintiff to go back to work, without listening to Plaintiff's side of the story or explaining what the problem was with her report. (*Id.* at 67:1–71:6.) The following day, Plaintiff apparently talked to two other employees in an attempt to discern what mistake she had made on the report and how to complete the form correctly. Plaintiff claims that McDunn entered the

---

**1.** Plaintiff originally asserted a claim for breach of contract as her sixth count, but has agreed to withdraw that claim as indicated in her Brief in Opposition to Defendant's Motion for Summary Judgment. (*See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 25.) Accordingly, the Court will dismiss Plaintiff's sixth count.

room during this conversation, looked at her report from the previous day, and embarrassed Plaintiff by screaming in a loud voice, "You're still doing it, this thing." (*Id.* at 72:12–75:10.)

Another incident concerned a memo which was circulated through Plaintiff's work area on or around April 3, 1992. Because Plaintiff was unable to read the memo, she asked Sue Arnold what it was about. According to Plaintiff, Rudolph heard the request and responded, "You don't read ... You don't understand." Arnold also allegedly commented on the fact that Plaintiff had been in the United States for twenty-eight years and still didn't understand English. Rudolph and Arnold then allegedly laughed about Plaintiff's inability to read or understand English. (*Id.* at 75:15–77:18; 79:2–9; 80:3–9.) Plaintiff contends that, on at least one other occasion thereafter, Arnold remarked on Plaintiff's inability to read, write or speak English after several years in the United States. (*Id.* at 87:5–11; 88:22–89:9; 95:8–96:3.)

Plaintiff also complains that on April 13, 1992 when she was off work, she received an anonymous telephone call but believed that in the background she could hear noise typical of the sounds at work. (*Id.* at 82:17–84:6.) Plaintiff maintains that the following day she mentioned the incident to a co-worker, who made the comment that "Rudy didn't call." When Plaintiff confronted the co-worker and pressed for information as to whether anyone from Blair *had* made the call, the co-worker allegedly blushed and "didn't know what to say." (*Id.* at 84:7–87:1.)

On May 14, 1992, Plaintiff was called to a meeting by Randy Scalise who was going to set her up for a "Right-to-Know" training at which time she would be provided with an interpreter. Plaintiff indicated that it was not necessary for her to have the training since she did not use any chemicals in her work area. (*Id.* at 106:18–108:20.) Plaintiff further indicated that she did not think it wise to bring someone in from the outside, since she knew the person who was going to act as an interpreter and would feel embarrassed. (*Id.* at 108:19–110:11; 117:3–9.) As a result, Mr. Scalise had Mrs. Waite sign a statement indicating that she did not want

the training, and the statement was witnessed by two other individuals. (*Id.* 112:9–115:3; 116:15–117:2.) Plaintiff claims she sought out Dorothy Dutcher, who was present during the meeting, because Plaintiff was upset by the incident and wanted to talk to Ms. Dutcher about it privately. While the two were conversing in the storage room, McDunn allegedly entered the room hollering at Plaintiff and calling her a troublemaker. (*Id.* at 118:16–120:20.)

Plaintiff also complains that in May, 1992 McDunn would not say good morning or good night to her, although he would greet other employees. (*Id.* at 121:5–122:9.) On May 21, 1992 when Plaintiff greeted McDunn by saying, "Good morning, Jim," he allegedly turned around and would not respond to her. (*Id.* at 122:2–7.)

On May 27, 1992, Plaintiff was asked by Norbert Preshak, a co-worker, who had hardly spoken to her for approximately eight months, "How long are you going to be here?" and "Are you going to give up here?" (*Id.* at 122:13–123:1.) Plaintiff testified at her deposition that she did not know what caused Mr. Preshak to make these remarks. (*Id.* at 123:18–23.) On another occasion, Mr. Preshak offered to assist Plaintiff with her work, but was allegedly instructed by McDunn not to help Plaintiff. (*Id.* at 126:5–127:1.)

Plaintiff also took offense at the fact that, when she brought earrings into work for some of the people, the co-workers refused to take them. (*Id.* at 104:1–105:10.) That same day, one of Plaintiff's fellow employees apparently relocated her table in such a manner that she would not have to face Plaintiff or be near her while working. (*Id.* at 105:12–106:17.)

Between 1989 and 1992 Plaintiff had several meetings with Richard Zimmerman, Vice President of Personnel, in which she allegedly complained to him of her work environment. (*Id.* at 25:11–18; 26:6–17.) Plaintiff claims that Zimmerman "yelled" at her during one of these meetings and informed Plaintiff that the people at Blair did not like working with her and were afraid of her. (*Id.* at 28:1–25; 29:1–3.) Because of Waite's

apparent difficulty with her co-workers, Zimmerman offered on several occasions to transfer Plaintiff to a different department at Blair, but Plaintiff refused the offers. (*Id.* at 30:20–33:6; 34:15–21; 37:2–4; 37:16–38:2.)

Plaintiff claims that, in spite of her meetings with Zimmerman and her complaints about the treatment she was receiving, the harassment continued. For example, on June 15, 1992, McDunn returned to work after having taken a trip to Central America. (*Id.* at 131:23–132:1.) When Waite asked him about the trip, McDunn allegedly responded "It was better than Korea," to which Plaintiff replied, "I hope so." (*Id.* at 132:2–23.)

Plaintiff further claims that, on June 23, 1992, during a work break, one of her co-workers stated in a loud voice and in the presence of several people, "You know in this country the middle class has had a pretty good life and it is being taken away from us by little people in other countries sending all kinds of things here." (*Id.* at 134:1–9.) Plaintiff could not recall at deposition whether or not she reported this incident to management personnel. (*Id.* at 135:4–7, 12–15.)

On another occasion in 1992, Plaintiff was waiting to get a box in her tow cart to take back to her work area. Mr. Rudolph was loading carts for two other female employees, but allegedly ignored Mrs. Waite and would not assist her. Plaintiff claims that, as Rudolph walked away, she said, "Rudy, me too." In response to this request, Rudolph allegedly threw a box on Plaintiff's cart and angrily walked away. (*Id.* at 50:2–52:9.)

Plaintiff also complains of two other incidents of anonymous harassment. Mrs. Waite maintains that on June 3, 1992, she noticed that a plastic cup that she had made to dispense inspection tickets had been cut with a sharp object so that it could not be

utilized. (*Id.* at 127:3–128:5.) In addition, on June 11, 1992, Plaintiff allegedly returned to work and found the items on her desk strewn about in a disorderly fashion. (*Id.* at 130:21–131:9.)

The final straw apparently came on September 24, 1992, when Waite received an annual employee performance report rating her performance in various categories such as quantity and quality of work, job knowledge, initiative and dependability. Overwhelmingly, Plaintiff was rated above average to superior, the sole exceptions being an average rating for "quality of work" and a written comment to the effect that Plaintiff lacked confidence in her co-workers and could improve her performance by showing them more consideration.[2] (*See* Defendant's Motion for Summary Judgment, Ex. G.) Nevertheless, Plaintiff took offense to the review and refused to sign the employee performance report. (Waite Deposition at 141:1–142:25; 144:8–10.) According to Waite, she asked McDunn why her evaluation was so low and he responded that "he could not give her any more than that." (Plaintiff's Br. in Opp. at 13–14; Waite Deposition at 141:2–5.) When Plaintiff asked what was wrong, McDunn remarked that it was her personality. (Waite Deposition at 141:6–15.)

Despite her essentially favorable review, Plaintiff became quite upset over the evaluation. She explained her mental state the day after the evaluation as follows:

> I work. I so miserable. What I—this my feel. Just my feeling. Why my evaluation so low? I'm a top inspector. Quantity higher than anybody else. How come she give me this kind of thing? ... That day I don't know what time I working, how long I working. Everybody finish; I'm still working. Somebody shut off the

2. Plaintiff received superior marks in the areas of quantity of work and dependability; above average marks for job knowledge, cooperation, initiative, attendance and punctuality, and an average rating for quality of work. In addition, the comment section to the evaluation form contained the following:

> Strong points: Sun has a vast knowledge of fabric and sewing techniques which enables her to perform her job well.

> Areas for improvement: She lacks confidence in her co-workers, showing them more consideration would benefit her.
> General: Suntok is good [sic], dependable worker. She is one of our top inspectors.

(Ex. G to Defendant's Motion for Summary Judgment.)

lights. I get up and walk away. Then I come home. (*Id.* at 147:3–12.)

After receiving her evaluation, Waite worked for Blair one more day, October 1, 1992. Waite claims that, as a result of her doctor's request, she was unable to return to work on October 2, 1992. She maintains that her inability to work was related to continuing harassment as well as chronic arm and shoulder injury.[3] (Complaint ¶ 48; Waite Deposition at 149:23–150:7.)

Because of the stresses related to her work environment, Plaintiff eventually sought treatment. In June of 1992, Plaintiff had spoken with John Carter about her work situation. (Waite Deposition at 160:16–161:7.) At that time, Mr. Carter expressed concern for Waite's well-being and suggested that she receive psychiatric treatment so that she could talk to someone about her problems. Plaintiff was referred to John Addis, Ph.D, a psychologist. (Waite Depo. at 160:16–161:7, 162:9–164:9; Ex. 7 to Waite Deposition; Plaintiff's Br. in Opp. at 14.)

In July of 1992, Plaintiff began treating with Dr. Addis, whom she saw on four occasions. After her initial appointment, Dr. Addis made a tentative finding that Plaintiff was suffering from agitated depression due to job stress. (Addis Deposition at 9:19–21; 11:4–8.) Dr. Addis eventually concluded that Plaintiff's job setting was responsible for her depressed condition and he opined that, although she would not be able to return to work for the present time, "[a]s time goes on through proper debriefing and work support by a company, I think there is a fair to good prognosis that some day she might be able to return to work." (*Id.* at 26:5–9; 26:19–27:6.)

In October of 1992, Dr. Addis referred Plaintiff to Dr. Allen Summers, a psychiatrist, who treated Plaintiff until approximately October of 1993. (Waite Deposition at 14:1–4; Deposition of Dr. Summers at 6:17–22.) At deposition, Dr. Summers observed that Plaintiff was extremely sensitive to criticism and that she found it very difficult to deal with individuals in a position of authority.[4]

On April 8, 1993, after Plaintiff exceeded the time period allotted to all employees who are continuously absent in excess of six months, Defendant terminated her. (Complaint ¶ 49; Defendant's Br. in Support of Motion for Summary Judgment, at 2.) Plaintiff does not dispute the fact that the termination was in accordance with the provisions of the Blair employee Handbook. (Exhibit D to Luksch Affidavit.)[5] Following her termination, Plaintiff filed the present action.

---

3. As a result of an arm injury which restricts her from lifting heavy objects, Plaintiff filed a worker's compensation claim. (Waite Deposition at 33:10–21.)

4. For example, in summarizing Plaintiff's history and condition, Dr. Summers testified as follows:
... I found [Plaintiff] to be quite focused on the injustice that she had perceived to an obsessional degree. And over the course of the treatment, I found it very difficult to bring her into some—any other interests or onto any other focus.
I've seen this particular kind of syndrome a number of times since that time. And I find that [Plaintiff] basically proceeded along a somewhat typical course of an individual who is heavily reliant on her job as her affirmation in life, basically, and heavily invested in a protectionistic way in carrying out the. job; and then at some point this view of herself and of her place in the world is shattered when she receives some criticism from people in authority.
And at that point there is an overpowering sense of injustice that overcomes individuals, and they become totally immersed in trying to right the wrong and seem very unable to get off that track. And this is basically Suntok's course as well.
I found it very difficult and basically impossible to get her going in any other direction. She remained entirely focused.

\* \* \* \* \* \*

Q: In the course of your psychiatric disability evaluation, were you able to determine what her functional limitations were?
A: I found that she was unable to function in any kind of supervised setting. She was very depressed, quite distraught, quite preoccupied with her concerns, and basically saw her as disabled.

\* \* \* \* \* \*

(Summers Deposition at 11:1–22; 13:13–19.)

5. The employee handbook provides as follows:
*Disability*
If you should be absent from full-time work due to a non-occupational or occupational accident or illness, all benefits provided under this plan for your dependents may be continued at your expense for a period of six months from the date you cease to be an active full-time employee. Benefits for yourself continue at no expense for

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party in entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party must demonstrate by affidavits and other materials the existence of specific material facts which give rise to a genuine issue. FED.R.CIV.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987); *Shultz v. Barko Hydraulics, Inc.*, 832 F.Supp. 142 (W.D.Pa.1993).

In order to defeat a motion for summary judgment, the non-movant may not rest upon bear assertions, conclusory allegations or mere suspicion, but must set forth specific facts showing that there is a genuine issue for trial. *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981); *Barcelona v. Fox Grocery Co. Employees' Pension Plan*, 483 F.Supp. 1128, 1134 (W.D.Pa.1980). An issue of material fact is considered "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

With these standards in mind, the Court turns to an examination of each of Plaintiff's claims.

the six month period at which time your status as an active employee of Blair Corporation will terminate. (Ex. D to Luksch Affidavit, at M–24.)

**6.** Waite does not allege any facts in Count II different from those alleged in Count I. Therefore, the two counts will be addressed together.

## IV. DISCUSSION

### A. *Plaintiff's Title VII Claims*

For her first and second counts, Plaintiff alleges that she was discriminated against due to her national origin and race with respect to compensation, tenure, promotions, terms, conditions and privileges of employment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the Civil Rights Act of 1991.[6] As to both counts, Waite claims that she was deprived of her job, promotions, wages, training, contributions and participation in pensions and other benefit plans, and seniority rights (among other things) as a result of Defendant's unlawful conduct. (Complaint ¶¶ 52–57.) Although not artfully pled in the Complaint, Waite appears to base her Title VII claims on an alleged hostile work environment and alleged retaliatory treatment for having filed two previous complaints with the Pennsylvania Human Relations Commission.[7]

### 1. *Plaintiff's Hostile Environment Claim*

This Circuit has held that the successful maintenance of a claim for a hostile work environment under Title VII requires proof of the following:

1. The employee suffered intentional discrimination because of his or her [race or ethnicity];

2. The discrimination was pervasive and regular;

3. The discrimination detrimentally affected the Plaintiff;

4. The discrimination would detrimentally affect a reasonable person of the same [race or ethnicity] in that position; and

5. There exists *respondeat superior* liability on the part of the employer.

**7.** On July 14, 1989 Plaintiff filed a complaint with the Pennsylvania Human Relations Commission (Plaintiff's Complaint, ¶ 8). A second complaint was filed with the Commission on August 5, 1991. (Plaintiff's Complaint, ¶ 11.) The PHRC eventually found no probable cause to pursue Plaintiff's claims. (Luksch Aff.Ex.F.)

**468**

*Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482 (3d Cir.1990).[8]

■ The threshold issue for this Court with respect to Plaintiff's hostile environment claim is whether Plaintiff has produced evidence of intentional discrimination based upon her race or national origin. The mere fact that a work environment may prove to be intolerable to a particular employee does not necessarily implicate Title VII, since the civil rights laws do not guarantee a working environment free of stress. *Bristo v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985), *cert. denied,* 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). The Seventh Circuit recently explained this concept in *Vore v. Indiana Bell Tel. Co., Inc.,* 32 F.3d 1161, 1162 (7th Cir.1994):

> Federal law provides that an employee is to be free from racial discrimination in the workplace, which includes freedom from a racially-hostile work environment. It does not guarantee a utopian workplace, or even a pleasant one. If the workplace is unsavory for any reason other than hostility generated on the basis of race, gender, ethnicity, or religion, no federal claim is implicated. In short, personality conflicts between employees are not the business of the federal courts.

Further, in reviewing this record for evidence of intentional discrimination sufficient to create a hostile work environment, the Court is mindful that it must look at the overall scenario, including the frequency of the discriminatory conduct and its severity, whether the conduct is physically threatening or a mere offensive utterance, and whether it unreasonably interfered with Plaintiff's work performance. *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22–24, 114 S.Ct. 367, 371, 126 L.Ed.2d 295 (1993).

■ Upon examination of Waite's long litany of complaints, the Court must conclude that, although the incidents Mrs. Waite expe-

rienced were perhaps personally upsetting to her, they nevertheless fail to demonstrate a discriminatory animus. For example, the bulk of Waite's complaints concern allegations that she was frequently "yelled at," that her co-workers and supervisors treated her inconsiderately, and that her superiors either did not listen to her side of the story or did not take her complaints seriously. There is no simply evidence of discriminatory treatment in these assertions aside from the fact that Plaintiff happens to be Korean.

■ The only incidents that could possibly be found to have a racial or national origin content are the alleged statement by Plaintiff's supervisor that Central America was a better place to visit than Korea, the alleged statement by a co-worker that the middle class in this country is being threatened by little people from other countries, and Arnold and McDunn's alleged remarks concerning Plaintiff's inability to speak English after 28 years in the United States. However, even if these comments could be construed as ethnic or racial slurs (which the Court does not find them to be), the "mere utterance of an [ethnic or racial] epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII." *Harris v. Forklift Sys., Inc., supra,* 510 U.S. at 21, 114 S.Ct. at 370 (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405–06, 91 L.Ed.2d 49 (1986)). Rather, Title VII is violated "[w]hen the workplace is *permeated with 'discriminatory intimidation, ridicule, and insult'* that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (Emphasis supplied.) The Court finds insufficient evidence on this record to create a genuine issue as to whether Plaintiff suffered intentionally discriminatory treatment, much less discrimination which was pervasive and regular.[9]

---

**8.** Although *Andrews* arose in the context of a sexual harassment claim, these same legal standards apply to discrimination claims based upon race or national origin. *See Russell v. Southeastern Pennsylvania Transportation Authority,* 63 Empl.Prac.Dec. (CCH) ¶ 42,777, 1993 WL

346058 at *5 (E.D.Pa. Sept. 8, 1993); *Garland v. USAir, Inc.,* 767 F.Supp. 715, 727 (W.D.Pa.1991).

**9.** The Court recognizes that the "pervasive and regular" requirement of *Andrews* differs slightly from that set forth in *Meritor, supra,* at 67, 106 S.Ct. at 2405–06, wherein the Supreme Court

Defendant has referred the Court to *McWilliams v. Western Pennsylvania Hospital*, 717 F.Supp. 351 (W.D.Pa.1989), a Title VII constructive discharge case which the Court finds persuasive. In *McWilliams*, the plaintiff had claimed that her supervisor engaged in a series of discriminatory actions toward her based on McWilliams' Irish heritage, which resulted in her constructive discharge. In support of her claim, McWilliams alleged (among other things) that she was not permitted to go to the bathroom unless it was her break time or lunch hour, she was not to talk to the other women in the department, she was to keep away from the men, she was not to wear perfume or hairspray and she was not to use the phone. *Id.* at 352. McWilliams also claimed that her supervisor had pulled a chair out from under her when she went to sit down, threw work at her, threw a phone receiver at her, pushed her and relocated McWilliams in front of the air conditioner despite medical restrictions to the contrary. *Id.* at 352–54. Moreover, McWilliams' supervisor had allegedly stated, "I don't like Irish people. In fact, I hate Irish people," and had inquired why McWilliams had an Irish flag out on her desk. *Id.* at 353.

In analyzing McWilliams' claim, the court observed that to make out a constructive discharge claim under Title VII:

> the discriminatory conduct must be associated in some fashion with the intolerable atmosphere leading to the constructive discharge. For this reason, there must be at least some relationship between the occurrence of the discriminatory conduct and the employee's resignation. ... Moreover, in the context of a national origin discrimination claim, the Plaintiff must show more than the "mere utterance of an ethnic epithet which engenders offensive feelings in an employee ..."

*Id.* at 355. After reviewing the totality of McWilliams' complaints, the court concluded that, although the work environment may indeed have been intolerable, there was insufficient evidence that it was the result of discriminatory action against Irish individuals. Further, the *McWilliams* court found that there was no connection between the alleged acts of discrimination and McWilliams' resignation. *Id.* at 356.

This Court finds that Waite's evidence of discrimination based upon national origin is far less compelling than that offered in *McWilliams*. *See also Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1265–66 (7th Cir.1993) (allegations that a supervisor had told plaintiff, an individual of Korean ancestry, to "learn to speak English" could not support a claim of discrimination where not related in any fashion to the employee's discharge; Court noted that "evidence of a supervisor's occasional and sporadic use of a slur directed at an employee's race, ethnic or national origin is generally not enough to support a claim under Title VII"), *cert. denied*, —— U.S. ——, 114 S.Ct. 1372, 128 L.Ed.2d 48 (1994).

■ Moreover, the Court concludes that Plaintiff cannot make the requisite showing on this record that a reasonable person of Plaintiff's race and national origin would have been detrimentally affected by the conduct of Blair's employees. *See Harris v. Forklift Sys., Inc.*, 510 U.S. at 20–22, 114 S.Ct. at 370 (conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview); *Andrews v. City of Philadelphia*, 895 F.2d at 1482. Plaintiff's extreme reaction in response to a relatively benign, if not complimentary, evaluation as well as her over-sensitivity to the rough and tumble of the workplace were unreasonable.[10] Given these crucial deficiencies, Waite's hostile environment claim cannot survive summary judgment.

---

advised that the alleged discriminatory conduct must be "pervasive or severe." The distinction is not significant for purposes of the present case, however, because the Court believes that Plaintiff has failed to meet the standards of either *Andrews* or *Meritor*.

**10.** In fact, the deposition testimony of Plaintiff's treating psychiatrist indicates that Plaintiff was possessed of an eggshell psyche. *See* note 4, *supra*, and discussion, *infra*, at IV–C.

### 2. Plaintiff's Retaliation Claim

■ Although not specifically pled as a separate count, Plaintiff alleges at Paragraph 47 of her Complaint that the actions of the Defendant were in retaliation against her for having filed two previous complaints with the PHRC. In order for a plaintiff to successfully assert a Title VII retaliation claim, there must be evidence from which the trier of fact could reasonably conclude: (1) that the plaintiff reasonably believed the employer was engaged in an employment practice unlawful under Title VII; and (2) that the employer retaliated against the plaintiff for protesting against that practice. *Drinkwater v. Union Carbide Corp.*, 904 F.2d 853, 865 (3d Cir. 1990); *Hicks v. ABT Associates, Inc.*, 572 F.2d 960, 967–69 (3d Cir.1978); *Grassinger v. Welty*, 818 F.Supp. 862, 873 (W.D.Pa.1992), *aff'd without op.*, 993 F.2d 224 (3d Cir.1993).

■ By these standards, Waite's retaliation claim cannot survive summary judgment. Even if the Court were to assume that Waite reasonably believed Blair engaged in discriminatory conduct against her, there is no evidence that Blair took any adverse actions against Waite in retaliation for the complaints filed with the Pennsylvania Human Relations Commission. For example, Waite maintains that she began experiencing "harassment" as early as 1987 and that, "since the second complaint had been filed [with the PHRC], there has been no let up in the harassment." (Complaint ¶ 15.) Since, by its very nature the retaliatory conduct must represent retaliation for engaging in protected activity (i.e., the filing of the Pennsylvania Human Relation Commission complaints), the retaliatory conduct cannot be both the *cause* of the PHRC complaints and their *effect* at the same time. *See Griffiths v. CIGNA Corp.*, 988 F.2d 457, 468 (3d Cir. 1993) (plaintiff must demonstrate causal link between adverse employment action and protected activity), *cert. denied*, 510 U.S. 865, 114 S.Ct. 186, 126 L.Ed.2d 145 (1993). Further, Waite has adduced no evidence that those who harassed her (primarily non management employees) knew about the PHRC complaints.

■ Plaintiff also maintains that she was unable to return to work in October of 1992 partly as a result of the emotional distress she experienced from her work environment. (Complaint ¶ 48.) To the extent that Plaintiff alleges discriminatory retaliation in the form of constructive discharge, the Court finds such a conclusion untenable. In order to establish constructive discharge under Title VII, a plaintiff must show that the employer knowingly permitted conditions of discrimination so intolerable that a reasonable person subject to them would foreseeably resign. *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 888 (3d Cir.1984). This Court has already determined, however, that there is insufficient evidence to support a finding either of ethnic or racial discrimination on the part of Blair, or of an environment sufficiently hostile that a reasonable person in Plaintiff's position would be forced to resign. Thus, Plaintiff cannot maintain her claim for retaliation in the nature of constructive discharge.

Finally, the Court finds a complete lack of evidence of improper discriminatory motive in Plaintiff's actual discharge on or about April 8, 1993. Plaintiff was formally terminated after she failed to return to work upon the cessation of her six month disability period. Plaintiff does not dispute this fact, nor does she dispute that her discharge was in accordance with the terms and conditions of the Blair Employee Handbook. (Ex. D to Luksch Aff at M–24.) Since there is absolutely no evidence of a causal link between this adverse employment action and Plaintiff's filing the PHRC complaints, Plaintiff cannot maintain a claim of retaliation on this basis. Finding no reasonable basis for a finding that Blair violated Title VII or the Civil Rights Act of 1991, summary judgment must be granted for Defendant on these claims.

### B. Plaintiff's PHRA Claim

For her third count, Plaintiff attempts to assert claims under the Pennsylvania Human Relations Act (the "PHRA"), PA.STAT. ANN. tit. 43, §§ 951 *et seq.* (1991 and Supp. 1995). Like Title VII, the PHRA makes it unlawful for any employer to discharge or otherwise discriminate against an employee with respect to compensation, hire, tenure,

terms, conditions or privileges of employment on the basis of (among other things) race or national origin. *Id.* § 955(a). The PHRA further prohibits discrimination resulting from an individual's opposition to, assistance in the investigation of, or filing a charge in relation to any practice forbidden by the PHRA. *Id.* at § 955(d).

The Court will not address this claim in detail. As discussed more fully above in the analysis of Plaintiff's Title VII claims, the Court finds insufficient evidence in this record to support a finding of racially or ethnically motivated discrimination by Defendant. Judgment will therefore be granted in favor of Blair with respect to Plaintiff's third count.

### C. *Plaintiff's ADA Claim*

For her fourth cause of action, Plaintiff alleges that Blair violated the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.* ("ADA"), by discriminating against her on the basis of disability and by failing to reasonably accommodate her disability. Initially, the Court notes that the exact nature of Plaintiff's alleged disability is somewhat unclear. Although she originally characterized her disability as an "injured arm and shoulder" (Complaint ¶ 1), Plaintiff seems to have retreated from this position in favor of a theory that her primary disability is mental—namely, "post traumatic stress disorder, anxiety, etc.":

"[w]hile the wrist splints [used in connection with her arm injury] were minor in nature, the post traumatic stress disorder, anxiety, etc. are major mental problems which affect a major life activity of the Plaintiff to such an extent that she would never be able to return to work with the Defendants by virtue of their conduct toward her."

(Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, at 24–25.) This Court believes that, under either theory, Plaintiff has failed to produce evidence sufficient to overcome Defendant's motion for summary judgment on this claim.

█ Assuming that the basis of Plaintiff's ADA claim is her injured arm and shoulder, Plaintiff has failed to establish that she was actually "disabled" within the meaning of the statute. "Disability" is defined by the ADA as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such an impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). As Defendant correctly notes, Mrs. Waite has failed either to assert or to produce any evidence suggesting that her injured arm and shoulder substantially limit her ability to perform a major life activity.[11] In fact, Plaintiff describes her arm condition as "minor in nature." (Plaintiff's Br. in Opp. at 24.) Because disability has not been demonstrated, Plaintiff cannot establish a prima facia case of discrimination under the ADA. Summary judgment for Blair is therefore proper.

█ Alternatively, even if Plaintiff's ADA claim is premised on her alleged mental impairment, the Court finds that Blair is entitled to summary judgment on this basis as well. The ADA protects only "qualified individual[s] with a disability" from various forms of discrimination based upon that disability. 42 U.S.C. § 12112. The term "qualified individual with a disability" is defined as "an individual with a disability *who, with or without reasonable accommodation, can perform the essential functions of the employment position* that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis supplied).

As a preliminary matter, the Court has some doubt as to whether Plaintiff is a "qualified individual with a disability," because the

---

11. The term "substantially limits," when used to describe the major life activity of working, means being significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average persons having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(i). Plaintiff's only allegation relating to impairment from her arm and shoulder injury are that she was restricted from lifting heavy boxes. (Complaint ¶ 18.) Plaintiff has produced no evidence demonstrating that she was physically incapable of performing a class of jobs or a broad range of jobs within the meaning of 29 C.F.R. § 1630.2(j)(3)(i).

evidence strongly suggests that Plaintiff is not able, either with or without reasonable accommodation, to perform the essential functions of her job. Dr. Summers' deposition testimony indicates that, as of her last treatment, Plaintiff was unable to function in any kind of supervised setting, that she tended to be hypersensitive to criticism, and that her preoccupation with her situation at Blair was obsessional. (Summers Deposition at 13:16–19; 15:20–25; 20:9–16; 33:4–6.) Significantly, when asked what caused Plaintiff's psychiatric condition, Dr. Summers opined:

A. I believe that her basic personality was one of perfectionistic—she's a perfectionistic individual, somewhat obsessional in her needs to perform well. Very tied into approval needs. Very connected to authority.

That may also be part of her culture, whereas authority carries weight of—not only authority but a critical or disapproving view by an authority figure is taken as massive disapproval and can result in a catastrophic loss of self-esteem.

\* \* \* \* \* \*

... And in the end she felt that she was severely reprimanded.

And this reprimand alone—the backdrop of the climate in the company and her basic personality, which had to do with perfectionistic needs, resulted in a catastrophic effect on her self-esteem.

(Summers Deposition at 17:10–18:16.) When asked whether Plaintiff had any type of disability as a result of her psychiatric problem, Dr. Summers testified, in relevant part, as follows:

A. Yes. I would say she does.

Q. Can you tell us what that disability would be?

A. I'd say given the diagnosis as I have given it, to put it in lay terms, that as of the last time I saw her I felt her incapable of applying for work, working under the supervision of an employer who at times might want to correct things she was doing or maybe instruct her or educate her perhaps in maybe not the most humanistic way but in a matter-of-fact way, that she

would not be able to respond to this favorably.

She has a great deal of difficulty understanding the language and the subtleties of it. She, I believe, is prone to misinterpretations, to be overly sensitive to anything that might be critical, and basically not able to function in a structured setting under the supervision of anybody except someone who might have as their agenda basically a therapy in which she would receive only the best positive regard, minimum of criticism. Certainly not the kind of thing that you would find in an industrial workplace.

\* \* \* \* \* \*

And I think she'd be very sensitive to any kind of negativism. And the chances of her being able to stay in a setting that would be stressful for her is, in the short run anyway, rather unlikely.

(Summers Deposition at 19:20–21:5.) The record before the Court compellingly demonstrates that Plaintiff is unable to perform the essential functions of an industrial type job, with or without accommodation. Accordingly, the Court finds that Plaintiff has failed to present sufficient evidence to create a genuine issue of fact with regard to whether she is a "qualified individual with a disability" under ADA.

▇ Moreover, even assuming that Plaintiff is a "qualified individual" within the meaning of the Act, her claim must fail because the evidence is undisputed that Blair attempted to make reasonable accommodations which Plaintiff declined. Plaintiff admits in her deposition, for example, that Mr. Zimmerman offered on numerous occasions to transfer Plaintiff to a different department within Blair. The bases for these offers (which included a proposed transfer to "light duty") were Plaintiff's apparent difficulty co-existing with her fellow employees and Plaintiff's arm injury. It is undisputed that Plaintiff declined these offers. (Waite Deposition at 30:20–33:6; 34:15–21; 37:2–4; 37:16–38:2.)

The ADA specifically provides that a "reasonable accommodation" may include job restructuring or reassignment to a vacant position. 42 U.S.C. § 12111(9)(B); 29 C.F.R.

§ 1630.2(*o*)(2)(ii). Moreover, although a person may choose not to accept a particular accommodation, if the individual rejects a reasonable accommodation or opportunity that is necessary to enable the individual to perform the essential functions of the position held and cannot, as a result of that rejection, perform the essential functions of the position, the individual will not be considered a qualified individual with a disability. 29 C.F.R. § 1630.9(d).

In light of the foregoing, Defendant is entitled to judgment on Plaintiff's ADA claim.[12]

### D. *Plaintiff's Wrongful Discharge Claim*

 Count V of Plaintiff's Complaint asserts a claim under the Pennsylvania state law doctrine of wrongful discharge. Specifically, Plaintiff alleges that Blair terminated her unlawfully and in violation of public policy—i.e. in retaliation for filing a worker's compensation claim, EEOC charges, and claims under the ADA. (Complaint ¶¶ 66, 67(a) and (d).) Plaintiff further alleges that Blair had no proper interest, right or justification in the termination, its sole motivation being "pure unadulterated malice." (Complaint ¶ 67(b)–(d).)

Plaintiff's assertions in support of this theory are seriously flawed. First, as discussed in relation to Plaintiff's Title VII claims, the Court has determined that Plaintiff was not discharged in October of 1992, constructively or otherwise. Rather, she chose to cease working based on her doctor's advice.

Second, Plaintiff has produced absolutely no evidence that her formal termination was

based on retaliatory motives of any sort. Plaintiff's discharge on April 8, 1993 resulted from her failure to return to work upon expiration of the company-wide disability leave period. It is uncontroverted that this termination was in accordance with the employee handbook then in effect at Blair. Plaintiff's final evaluation was essentially favorable and recognized her good work performance.

In her brief opposing summary judgment, Plaintiff cites several cases for the proposition that employers violate public policy by discharging employees for the exercise of their legal rights. (Plaintiff's Br. in Opp. at p. 26.) While Plaintiff may have accurately stated this particular rule of law, the record is devoid of any evidence demonstrating that such was the case here. Plaintiff's assertion that, "In the instant case, the discharge was, at least in part, predicated upon the Plaintiff's filing for workmen's compensation" (*Id.* at 26), is mere speculation and insufficient for Plaintiff's claim to withstand summary judgment. Accordingly, judgment will be entered for Blair on Plaintiff's wrongful discharge claim.

### E. *Plaintiff's Intentional Infliction of Emotional Distress Claim*

Finally, Plaintiff has asserted a claim for intentional infliction of emotional distress as her seventh cause of action. Defendant moves for summary judgment on the grounds that: (1) the claim is barred by the exclusivity provision of the Worker's Compensation Act, PA.STAT.ANN. tit. 77, § 481(a) (1992), and (2) Plaintiff has failed to

---

12. The Pennsylvania Human Relations Act forbids discrimination in the employment context based on a non-job related handicap or disability, if the individual is the best able and most competent to perform the services required. *See* PA. STAT.ANN. tit. 43, § 955(a). To the extent that Plaintiff attempts to assert a violation of the PHRA based on disability (*see* Complaint ¶ 59), the Court's analysis does not materially change, nor does our conclusion that summary judgment for Blair is appropriate. For purposes of the PHRA, the term "handicapped or disabled person" essentially mirrors the definition used in the ADA. PA.STAT.ANN. tit. 43, § 954 (p. 1); *McCloskey v. Nu–Car Carriers, Inc.*, 387 Pa.Super. 466, 564 A.2d 485, 487–88 (1989) (citations omitted), *appeal denied*, 525 Pa. 585, 575 A.2d

115 (1990). For the reasons discussed above, the Court finds no evidence on which Plaintiff can demonstrate a disability based on her alleged arm injury.

Moreover, the PHRA protects only "non-job related" handicaps or disabilities, which is defined as "any handicap or disability which does not substantially interfere with the ability to perform the essential functions of the employment" which the handicapped person is engaged in. 43 PA.STAT.ANN. § 954(p). As set forth above, a reasonable finder of fact could not conclude, based on this record, that Plaintiff had a "non-job related" mental impairment, since the evidence indicates that Plaintiff is unable to function in the kind of supervised industrial work environment that existed at Blair.

establish a prima facia case of intentional infliction of emotional distress.

■ Although several courts have held that the Pennsylvania Workers Compensation Act bars claims for intentional infliction of emotional distress in the employment context,[13] the Court need not address this issue because it finds that, in any event, the alleged incidents of harassment do not rise to the level of "extreme and outrageous conduct" on the part of Blair.

■ Pennsylvania law requires that, in order for a plaintiff to recover for intentional infliction of emotional distress, a defendant's conduct must be so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Miller v. Aluminum Co. of America*, 679 F.Supp. 495, 507 (W.D.Pa.1988), *aff'd*, 856 F.2d 184 (3d Cir. 1988); *Hackney v. Woodring*, 424 Pa.Super. 96, 622 A.2d 286, 288 (1993), *order rev'd*, 539 Pa. 266, 652 A.2d 291 (1994). Mere callousness or insensitivity on the part of the defendant does not suffice to establish liability. *McFadden v. Burton*, 645 F.Supp. 457, 463 (E.D.Pa.1986).

Upon review of the record in this case, the Court finds that Blair's alleged conduct simply does not rise to the level of extreme and outrageous conduct contemplated by Pennsylvania law. Moreover, this determination is in accordance with the decisions of other courts in similar cases. *See, e.g., Andrews v. City of Philadelphia*, 895 F.2d 1469, 1487 (3d Cir.1990) (actions of male police captain and sergeant, including verbal reprimands of plaintiff and general acquiescence in sexually hostile environment did not rise to extreme and outrageous conduct, especially where defendants did not personally encourage, endorse or sponsor every incident); *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988) (noting that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to allow recovery for intentional infliction of emotional distress); *James v. International Business Machines Corp.*, 737 F.Supp. 1420, 1428 (E.D.Pa.1990) (employee failed to demonstrate extreme and outrageous conduct where she alleged being the target of relentless joking and harassment for two years, was called a derogatory name on two occasions, and was berated by two managers an unspecified number of times); *Sharon Steel Corp. v. VJR Co.*, 604 F.Supp. 420, 422 (W.D.Pa.1985) (allegation that company forced employee to quit his job and take early retirement was insufficient to state claim for intentional infliction of emotional distress); *Madreperla v. Williard Co.*, 606 F.Supp. 874, 880 (E.D.Pa.1985) (employer's premeditated plan to force an employee to resign by making the employment conditions difficult typically does not amount to extreme or outrageous conduct sufficient to sustain a cause of action for intentional infliction of emotional distress).

Judgment will be entered for Defendant with respect to Plaintiff's seventh count.

## V. CONCLUSION

For the foregoing reasons, the Court finds that summary judgment for Defendant is appropriate with respect to Plaintiff's Counts I, II, III, IV, V, and VII.

---

**13.** *See, e.g., Gilmore v. Manpower, Inc.*, 789 F.Supp. 197 (W.D.Pa.1992); *Stylianoudis v. Westinghouse Credit Corp.*, 785 F.Supp. 530 (W.D.Pa.1992); *Santiago v. Pennsylvania Nat. Mut. Cas. Ins. Co.*, 418 Pa.Super. 178, 613 A.2d 1235 (1992).